Ricky **BROWN**, on behalf of himself and all other persons similarly situated; Jamel Champen, on behalf of himself and all other persons similarly situated; Sheryl Champen, on behalf of herself and all other persons similarly situated; Hopeton Gordon, on behalf of himself and all other persons similarly situated; Jean Cantave, on behalf of himself and all other persons similarly situated; Raishawn Morris, on behalf of himself and all other persons similarly situated; Tim Richardson, on behalf of themselves and all other persons similarly situated; Darryl Taylor, on behalf of themselves and all other persons similarly situated; Robert Walker, on behalf of themselves and all other persons similarly situated; Clement Mallory, on behalf of themselves and all other persons similarly situated; Ronald Sanchez, on behalf of themselves and all other persons similarly situated; Darnell Lemons, on behalf of themselves and all other persons similarly situated; John Butler, on behalf of themselves and all other persons similarly situated; Jason Childs, on behalf of themselves and all other persons similarly situated; Paul Heyward, Jr., on behalf of themselves and all other persons similarly situated; Ronald Jennings, on behalf of themselves and all other persons similarly situated; Paul Howe, on behalf of themselves and all other persons similarly situated; Bubu DeMasio, on behalf of themselves and all other persons similarly situated; Wilson Acosta, on behalf of themselves and all other persons similarly situated; Chris Holland, on behalf of themselves and all other persons similarly situated; Jermaine Adams, on behalf of themselves and all other persons similarly situated; Felix Francis, on behalf of themselves and all other persons similarly situated; Daniel Sontag, on behalf of themselves and all other persons similarly

situated; Ronald Lynch, on behalf of themselves and all other persons similarly situated; Kenneth McClain, on behalf of themselves and all other persons similarly situated; Hervey Pierre, on behalf of themselves and all other persons similarly situated; Vincent Quinones, on behalf of themselves and all other persons similarly situated; Laurence Plaskett, on behalf of themselves and all other persons similarly situated; Lamont Wyche, on behalf of themselves and all other persons similarly situated; Steven York, on behalf of themselves and all other persons similarly situated; Tyrone Lohr, on behalf of themselves and all other persons similarly situated; King Gonzalez, on behalf of themselves and all other persons similarly situated, Plaintiffs–Appellants,

Raishawn Morris, Appellant,

Charles Battiste, on behalf of himself and all other persons similarly situated; Wayne Lewis, on behalf of himself and all other persons similarly situated; Michael Christian, on behalf of themselves and all other persons similarly situated; Major Barnett, on behalf of himself and all other persons similarly situated, Plaintiffs,

v.

CITY OF ONEONTA, NEW YORK; Police Department of the City of Oneonta, New York; John J. Donadio, Chief of Police of the City of Oneonta, in his individual and official capacities; Joseph Redmond, Oneonta Police Officer, in his individual and official capacities; William M. Davis, Oneonta Police Officer, in his individual and official capacities; X. Olsen, Oneonta Police Officer, in his individual and official capacities; Anonymous Officers and Investigators of the Police Department of the City of Oneonta, in their individual and official capaci-

ties; The State of New York; State University of New York; State University of New York, College at Oneonta ("SUCO"); New York State Division of State Police; H. Karl Chandler, New York State Police Investigator, in his individual and official capacities; Robert Farrand, New York State Police Troop C Commander, in his individual and official capacities; George Clum, New York State Police Investigator, in his individual and official capacities; Kevin More, New York State Police Investigator, in his individual and official capacities; John Way, New York State Police Investigator, in his official capacities; Mark Kimball, New York State Trooper, in his individual and official capacities; Kenneth Grant, New York State Trooper, in his individual and official capacities; New York State Trooper Farrago, in his individual and official capacities; Anonymous State Police Officials and Investigators, in their individual and official capacities; SUCO Department of Public Safety; Merritt Hunt, SUCO Department of Public Safety Officer, in his individual and official capacities; Tim Jackson, SUCO Department of Public Safety Officer, in his individual and official capacities; John Edmondson, SUCO Department of Public Safety Officer, in his individual and official capacities; Hartmark Leif, in his individual and official capacities; Eric Wilson, in his individual and official capacities; Carl Shedlock, Oneonta Police Officer, in his individual and official capacities; Anonymous Public Safety Officers, in their individual and official capacities; Anonymous SUCO Computer Employees, in their individual and official capacities; Sean Ralph, Otsego County Sheriff's Deputy; Chris Lehenbauer, Otsego County

Sheriff's Deputy; Anonymous Otsego City; Anonymous Otsego County Sheriff's Deputies, Investigators and/or Officers, Defendants–Appellees.

Docket No. 98–9375.

United States Court of Appeals, Second Circuit.

Argued June 4, 1999.

Decided Oct. 26, 1999.

Amended Aug. 8, 2000.

D. Scott Bassinson, Esq., Whiteman Osterman & Hanna, Albany, N.Y., for Plaintiffs–Appellants.

Denise A. Hartman, Assistant Attorney General (Eliot Spitzer, Attorney General of the State of New York, Peter H. Schiff, Acting Solicitor General, Nancy A. Spiegel, Assistant Attorney General, of counsel ), Albany, N.Y., for State Defendants–Appellees. Daniel J. Stewart, Esq., Dreyer Boyajian LLP, Albany, N.Y., for City Defendants–Appellees. Charles Stephen Ralston, Esq., NAACP Legal Defense and Educational Fund, Inc. (Elaine R. Jones, Director–Counsel, Norman J. Chachkin, David T. Goldberg, Paul K. Sonn, on the brief), New York, N.Y., Arthur N. Eisenberg, New York Civil Liberties Union Foundation, New York, N.Y., and William Goodman, Center for Constitutional Rights, New York, N.Y., as Amici Curiae in support of Plaintiffs–Appellants.

James B. Tuttle, Esq., Bohl, Della Rocca & Dorfman, P.C., for the Police Conference of New York, Inc., Amicus Curiae in support of City Defendants–Appellees.

Before: OAKES and WALKER, Circuit Judges, and GOLDBERG,[*] Judge.

## [AMENDED OPINION]

JOHN M. WALKER, Circuit Judge:

Plaintiffs-appellants, black residents of Oneonta, New York, appeal from the September 9, 1998 judgment of the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Chief Judge* ). Plaintiffs' claims arise from their interactions with police authorities during an investigation conducted by the New York State and Oneonta Police Departments based on a victim's description of a suspect that consisted primarily of the suspect's race. Plaintiffs asserted claims under 42 U.S.C. § 1983 alleging violations of the Equal Protection Clause and the Fourth Amendment, claims under 42 U.S.C. §§ 1981, 1985(3) and 1986, and other related federal and state causes of action. The district court granted summary judgment for defendants on some of plaintiffs' claims and dismissed others on the pleadings, and the parties stipulated to the discontinuance and dismissal of the remaining claims.

This case bears on the question of the extent to which law enforcement officials may utilize race in their investigation of a crime. We hold that under the circumstances of this case, where law enforcement officials possessed a description of a criminal suspect, even though that description consisted primarily of the suspect's race and gender, absent other evidence of discriminatory racial animus, they could act on the basis of that description without

* The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

violating the Equal Protection Clause. Accordingly, we affirm the dismissal of plaintiffs' § 1983 claims under the Fourteenth Amendment as well as their claims under 42 U.S.C. §§ 1981, 1985(3) and 1986.

Police action is still subject to the constraints of the Fourth Amendment, however, and a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure. In this case, certain individual plaintiffs were subjected to seizures by defendant law enforcement officials, and those individuals may proceed with their claims under the Fourth Amendment.

## BACKGROUND

### I. Factual Background

Oneonta, a small town in upstate New York about sixty miles west of Albany, has about 10,000 full-time residents. In addition, some 7,500 students attend and reside at the State University of New York College at Oneonta ("SUCO"). The people in Oneonta are for the most part white. Fewer than three hundred blacks live in the town, and just two percent of the students at SUCO are black.

On September 4, 1992, shortly before 2:00 a.m., someone broke into a house just outside Oneonta and attacked a seventy-seven-year-old woman. The woman told the police who responded to the scene that she could not identify her assailant's face, but that he was wielding a knife; that he was a black man, based on her view of his hand and forearm; and that he was young, because of the speed with which he crossed her room. She also told the police that, as they struggled, the suspect had cut himself on the hand with the knife. A police canine unit tracked the assailant's scent from the scene of the crime toward the SUCO campus, but lost the trail after several hundred yards.

The police immediately contacted SUCO and requested a list of its black male students. An official at SUCO supplied the list, and the police attempted to locate and question every black male student at SUCO. This endeavor produced no suspects. Then, over the next several days, the police conducted a "sweep" of Oneonta, stopping and questioning non-white persons on the streets and inspecting their hands for cuts. More than two hundred persons were questioned during that period, but no suspect was apprehended. Those persons whose names appeared on the SUCO list and those who were approached and questioned by the police, believing that they had been unlawfully singled out because of their race, decided to seek redress.

### II. Procedural History

In early 1993, the SUCO students whose names appeared on the list and other persons questioned during the sweep of Oneonta filed this action in the district court against the City of Oneonta, the State of New York, SUCO, certain SUCO officials, and various police departments and police officers.[1] Plaintiffs sought certification of two plaintiff classes consisting of the 78 students on the list as Class I, and those persons, whether students or not, stopped and questioned by the police as Class II.

In their amended complaint, plaintiffs asserted, under 42 U.S.C. § 1983, that defendants violated their rights under the Fourth Amendment and the Equal Protection Clause of the United States Constitution by questioning the black SUCO students and by conducting the sweep of Oneonta. Plaintiffs also alleged related claims under 42 U.S.C. §§ 1981, 1985(3) & 1986, and under Title VI, 42 U.S.C.

---

**1.** Specifically, the complaint named: the New York State Police, and State Police Officers Chandler, Farrand, Clum, More, Way, Kimball, Grant, and Farrago; the SUCO Department of Public Safety, and its Officers Hunt, Jackson, and Edmondson; the Oneonta Police Department, and its Officers Donadio, Shedlock, Redmond, Olsen, and Davis; and anonymous officials of all three departments.

§ 2000d, and asserted various state law claims. Plaintiffs whose names appeared on the list also asserted claims under §§ 1983, 1985(3) and 1986 alleging that certain defendants had violated their rights under the Family Educational Rights and Privacy Act of 1974 ("FER-PA"), 20 U.S.C. § 1232g, by releasing the list to the police.

Both sides moved for summary judgment, and defendants moved to dismiss certain claims on the pleadings. On December 13, 1993, ruling from the bench, the district court certified Class I, but refused to certify Class II on the ground that each individual had experienced a separate and factually distinct encounter with the police. As there are no remaining claims arising from the release of the student list, Class I is of no continuing significance in the case.[2] The plaintiffs seeking Class II certification, however, proceeded individually.

The district court dismissed one plaintiff's Fourth Amendment claim (because that plaintiff had not detailed the circumstances of his contact with law enforcement) and granted summary judgment for defendants on the remaining Fourth Amendment claims on the ground that the police encounters during the sweep were not seizures. The district court dismissed the equal protection claims, with leave to replead, on the ground that plaintiffs had not properly pleaded the existence of "a similarly-situated group of non-minority individuals [that] were treated differently by law enforcement officers during the investigation of a crime." The district court granted defendants' motion to dismiss the § 1985(3) and § 1986 claims insofar as they were based on the Fourth Amendment, the Equal Protection Clause, or state law, but denied the motion to dismiss plaintiffs' claims under § 1981 and Title VI. The court dismissed some state law claims and allowed others to continue. In addition, the district court granted summary judgment on all claims in favor of defendants Redmond and Olsen, Oneonta police officers who had submitted unchallenged affidavits stating that they had not participated in any of the events giving rise to the complaint.[3]

Both sides moved for reconsideration of various portions of the district court's ruling, and on July 18, 1994, the district court filed a second opinion. The district court granted defendants' motion to reconsider its ruling on the § 1981 claims, and dismissed those claims with leave to replead. As with the equal protection claims, the district court held that § 1981 claims "require a showing of specific instances … where the plaintiffs were singled out for unlawful oppression in contrast to others similarly situated."

Plaintiffs filed a second amended complaint on January 30, 1995. This complaint added twenty-seven new plaintiffs and several new defendants[4] and repleaded the federal claims that the district court had dismissed. Defendants again moved to dismiss and for summary judgment, and on January 3, 1996, the district court filed its next opinion. As to the newly added Fourth Amendment claims, the district court dismissed them or granted summary judgment for defendants on every claim except those of plaintiffs Jennings, Quinones, and Plaskett. The district court granted summary judgment on all of the new Fourth Amendment claims in favor of defendants Chandler, Farrand, More, Way, Kimball, Grant, and Farrago, all of

**2.** On interlocutory appeal, a panel of this court held that the SUCO officials were entitled to qualified immunity from all claims arising from the release of the list. *See Brown v. City of Oneonta*, 106 F.3d 1125 (2d Cir. 1997). Accordingly, those claims are no longer part of this case.

**3.** Plaintiffs do not contest on appeal the district court's grant of summary judgment in favor of Redmond and Olsen.

**4.** The second amended complaint added defendants Ralph and Lehenbauer, Deputies of the Otsego County Sheriff's Office, as well as other anonymous Otsego County officers.

whom are State Police Officers who had submitted unopposed affidavits indicating that they had had no contact with plaintiffs.[5] The district court again rejected the equal protection claims on the ground that plaintiffs had failed to "allege that a similarly situated group of non-minority individuals was treated differently." It dismissed plaintiffs' § 1981 claims for the same reason, denied summary judgment on plaintiffs' § 1983 claims against the City of Oneonta, and granted summary judgment for all defendants on the §§ 1985(3) and 1986 claims.[6]

Following the decisions of the district court, the parties entered into several stipulations with a view to securing an appealable final judgment. On September 8, 1997, Quinones discontinued his claims against Oneonta Police Officers Donadio, Davis, and Shedlock. All of the plaintiffs except Michael Christian then stipulated to (1) the discontinuance with prejudice of all of the federal claims that the district court had not yet determined in favor of defendants;[7] and (2) the dismissal of all of the supplemental state law claims without prejudice, but with an agreement not to reinstate those claims in the Northern District of New York. Christian's action was dismissed for failure to prosecute by an order filed on August 13, 1998, and final judgment was entered on September 9, 1998.

The plaintiffs appealed and we issued an opinion on October 26, 1999, affirming the denial of plaintiffs' equal protection challenge, while vacating summary judgment as to certain plaintiffs' Fourth Amendment claims and remanding for further proceedings. *See Brown v. City of Oneonta*, 195 F.3d 111 (2d Cir.1999). On December 17, 1999, plaintiffs filed a petition for rehearing and for rehearing in banc. The panel subsequently decided on changes to the opinion. In addition to modifying the text of the original opinion in certain respects, this amended opinion, while adhering to the result originally reached on the equal protection claim, changes the result, and thereby grants rehearing, as to certain plaintiffs' Fourth Amendment claims. Upon the filing of this amended opinion, the original opinion is vacated.

## DISCUSSION

On appeal, plaintiffs raise several contentions of error: first, that the district court improperly dismissed their § 1983 claims under the Equal Protection Clause using an incorrect pleading standard; second, that the district court made the same error in dismissing their § 1981 claims; third, that the district court erroneously dismissed or granted summary judgment against plaintiffs on their § 1983 claims under the Fourth Amendment; and finally, that the district court improperly dismissed their "derivative" claims under §§ 1985(3) and 1986. We affirm the dismissal of plaintiffs' equal protection and § 1981 claims, but we reverse in part the district court's rulings on plaintiffs' claims under the Fourth Amendment. We will discuss the particulars of each of plaintiffs' claims in turn.

### I. Equal Protection Claims

 The Fourteenth Amendment to the United States Constitution declares that "[n]o State shall ... deny to any

---

**5.** Plaintiffs do not appeal the district court's ruling with respect to these defendants.

**6.** Another motion for reconsideration produced yet a fourth order by the district court, filed on February 20, 1996. This order did not materially alter the district court's holdings with regard to the substantive issues in the case, but the district court did dismiss the Fourth Amendment claims against SUCO defendants Wilson, Jackson, and Hunt and against State Police defendant Clum on the basis of affidavits stating their lack of personal involvement with any of the plaintiffs. Plaintiffs do not contest the district court's ruling with respect to these defendants.

**7.** These included plaintiffs' § 1983 *Monell* claims against the City of Oneonta, and the Fourth Amendment claims of plaintiffs Jennings, Quinones, and Plaskett.

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race. *See Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d Cir.1999).

▪ There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause. A plaintiff could point to a law or policy that "expressly classifies persons on the basis of race." *Id.* (citing *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213, 227–29, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)). Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. *See Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Johnson v. Wing,* 178 F.3d 611, 615 (2d Cir.1999).

Plaintiffs seek to plead an equal protection violation by the first method enumerated above. They contend that defendants utilized an express racial classification by stopping and questioning plaintiffs solely on the basis of their race. Plaintiffs assert that the district court erred in requiring them to plead the existence of a similarly situated group of non-minority individuals that were treated differently in the investigation of a crime.

▪ When pleading a violation of the Equal Protection Clause, it is sometimes necessary to allege the existence of a simi-larly situated group that was treated differently. For example, if a plaintiff seeks to prove selective prosecution on the basis of his race, he "must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

▪ Plaintiffs are correct, however, that it is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification. These classifications are subject to strict judicial scrutiny, *see Able v. United States,* 155 F.3d 628, 631–32 (2d Cir.1998), and strict scrutiny analysis in effect addresses the question of whether people of different races are similarly situated with regard to the law or policy at issue. This does not avail plaintiffs in this case, however, because they have not identified any law or policy that contains an express racial classification.

▪ Plaintiffs do not allege that upon hearing that a violent crime had been committed, the police used an established profile of violent criminals to determine that the suspect must have been black. Nor do they allege that the defendant law enforcement agencies have a regular policy based upon racial stereotypes that all black Oneonta residents be questioned whenever a violent crime is reported. In short, plaintiffs' factual premise is not supported by the pleadings: they were not questioned solely on the basis of their race. They were questioned on the altogether legitimate basis of a physical description given by the victim of a crime. Defendants' policy was race-neutral on its face; their policy was to investigate crimes by interviewing the victim, getting a description of the assailant, and seeking out persons who matched that description. This description contained not only race, but also gender and age, as well as the possibility of a cut on the hand. In acting on the description provided by the victim of the assault—a description that included

race as one of several elements—defendants did not engage in a suspect racial classification that would draw strict scrutiny. The description, which originated not with the state but with the victim, was a legitimate classification within which potential suspects might be found.

Plaintiffs cite to cases holding that initiating an investigation of a person based solely upon that person's race violates the Equal Protection Clause. In *United States v. Avery*, 137 F.3d 343 (6th Cir. 1997), the defendant claimed that he was stopped by law enforcement solely on the basis of his race. While the court affirmed his conviction, citing other factors utilized by the police in choosing to follow the defendant, the court stated that "[i]f law enforcement ... takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *Id.* at 355; *see also United States v. Scopo*, 19 F.3d 777, 786 (2d Cir. 1994) (Newman, J., concurring) (speculating that while pretextual traffic stops based on probable cause are not Fourth Amendment violations, their selective use based on race could violate the Equal Protection clause). Here, the police were not routinely patrolling an airport for possible drug smuggling, as in *Avery*.[8] Instead, it is alleged that they were searching for a particular perpetrator of a violent assault, relying in their search on the victim's description of the perpetrator as a young black man with a cut on his hand. As the police therefore are not alleged to have investigated "based solely upon ... race,

without more," *id.*, plaintiffs have failed to state an actionable claim under the Equal Protection Clause.

■ Police practices that mirror defendants' behavior in this case—attempting to question every person fitting a general description—may well have a disparate impact on small minority groups in towns such as Oneonta. If there are few black residents who fit the general description, for example, it would be more useful for the police to use race to find a black suspect than a white one. It may also be practicable for law enforcement to attempt to contact every black person who was a young male, but quite impossible to contact every such white person. If a community were primarily black with very few white residents and the search were for a young white male, the impact would be reversed. The Equal Protection Clause, however, has long been interpreted to extend to governmental action that has a disparate impact on a minority group only when that action was undertaken with discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 239–41, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Without additional evidence of discriminatory animus, the disparate impact of an investigation such as the one in this case is insufficient to sustain an equal protection claim.

In this case, plaintiffs do not sufficiently allege discriminatory intent. They do allege that at least one woman, Sheryl Champen, was stopped by law enforcement officials during their sweep of Oneonta.

---

8. The court's opinion in *Avery* also contained dicta to the effect that even if the police receive a "tip" consisting solely of a persons's race, "and the officers pursue investigations of everyone of that race, their action may be found constitutionally impermissible." 137 F.3d at 354 n. 5; *but cf. Buffkins v. City of Omaha*, 922 F.2d 465, 468 (8th Cir.1990) (holding that detention of black woman at an airport did not amount to racial discrimination under § 1981 because "her race matched the racial description of the person described in the tip"). We do not know if the "tip" contemplated by the *Avery* court is similar to

a victim's description of an assailant; as the *Avery* court itself pointed out in somewhat contradictory fashion, where there is a tip from an outside source, "the officers obviously cannot control the race of the person they investigate and ultimately contact. Hence, their selection of that person as a target of investigation does not amount to an equal protection violation." 137 F.3d at 354 n. 5. In any event, this non-binding dicta from a non-binding circuit court does not persuade us that the police action in this case violated the Equal Protection Clause.

This allegation is significant because it may indicate that defendants considered race more strongly than other parts of the victim's description. However, this single incident, to the extent that it was related to the investigation, is not sufficient in our view to support an equal protection claim under the circumstances of this case.

We are not blind to the sense of frustration that was doubtlessly felt by those questioned by the police during this investigation. The actions of the police were understandably upsetting to the innocent plaintiffs who were stopped to see if they fit the victim's description of the suspect. The plaintiffs have argued that there is little difference between what occurred here and unlawful profiling based on a racial stereotype. While we disagree as a matter of law and believe that the conduct of the police in the circumstances presented here did not constitute a violation of the equal protection rights of the plaintiffs, we do not establish any rule that would govern circumstances giving rise to liability that are not present in this case. Any such rule will have to wait for the appropriate case. Nor do we hold that under no circumstances may the police, when acting on a description of a suspect, violate the equal protection rights of non-suspects, whether or not the police only stop persons conforming to the description of the suspect given by the victim.

We are also not unmindful of the impact of this police action on community relations. Law enforcement officials should always be cognizant of the impressions they leave on a community, lest distrust of law enforcement undermine its effectiveness. Cf. Sean Hecker, *Race and Pretextual Traffic Stops: An Expanded Role for Civilian Review Boards*, 28 Colum. Hum. Rts. L.Rev. 551, 552 (1997) (describing the impact on the community of race-based pretextual traffic stops). Yet our role is not to evaluate whether the police action in

question was the appropriate response under the circumstances, but to determine whether what was done violated the Equal Protection Clause. We hold that it did not, and therefore affirm the district court's dismissal of plaintiffs' § 1983 claims alleging equal protection violations.[9]

## II. *Section 1981 Claims*

■ To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities. See *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam). Those enumerated activities include the rights "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a).

■ Plaintiffs' claims under 42 U.S.C. § 1981 suffer from the same shortcomings as their equal protection claims. Section 1981, like the Equal Protection Clause, only prohibits intentional racial discrimination. See *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *see also Albert v. Carovano*, 851 F.2d 561, 573 (2d Cir.1988) (holding that to plead a § 1981 claim alleging selective enforcement, plaintiff must allege instances in which "similarly situated" non-minorities were treated differently). Accordingly, plaintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause, and these claims were insufficiently pleaded for the reasons stated above. We therefore affirm the dismissal of plaintiffs' § 1981 claims.

---

9. To the extent that this opinion clarifies equal protection law, the district court is free on remand to entertain a motion to replead.

We express no opinion on the merits of any such motion.

### III. Fourth Amendment Claims

Plaintiffs' § 1983 claims also allege a violation of their Fourth Amendment rights during defendants' sweep of Oneonta. The district court dismissed many of these claims and granted summary judgment for defendants on other claims because, in its view, plaintiffs had not been subject to "seizures" under the Fourth Amendment.[10] For the reasons that follow, we vacate the summary judgment against plaintiffs Jamel Champen, Jean Cantave, Ricky Brown, and Sheryl Champen, and affirm the district court's dismissal or grant of summary judgment with regard to the remaining claims.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court established that the Fourth Amendment does not prohibit the police from stopping a person for questioning when the police have a reasonable suspicion that a person may be armed and dangerous, even when that suspicion does not amount to the probable cause necessary to make an arrest. *See id.* at 24–27, 88 S.Ct. 1868; *United States v. Jaramillo*, 25 F.3d 1146, 1150–51 (2d Cir.1994). Defendants would have difficulty demonstrating reasonable suspicion in this case, and indeed, they do not attempt to do so. Defendants instead argue that the district court correctly determined that no reasonable suspicion was necessary, because no seizure—not even a *Terry* stop—occurred in this case.

▪ To prevail on a § 1983 claim under the Fourth Amendment based on an allegedly unlawful *Terry* stop, a plaintiff first must prove that he was seized. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). However, a seizure does occur when, "by means of physical force or show of authority," *United States v. Hooper*, 935 F.2d 484, 491 (2d Cir.1991)

(quoting *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868), a police officer detains a person such that "a reasonable person would have believed that he was not free to leave," *id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Pertinent factors identifying a police seizure can include

> the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Hooper*, 935 F.2d at 491 (quoting *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990)). Whether a seizure occurred is a question of law to be reviewed *de novo*, while the factual findings underlying that determination are reviewed for clear error. *See, e.g., United States v. Peterson*, 100 F.3d 7, 11 (2d Cir.1996); *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir.1995)

▪ Jamel Champen, in his affidavit, alleges that a police officer pointed a spotlight at him and said "What, are you stupid? Come here. I want to talk to you." He was then told to show his hands. While it is arguably a close case, we conclude that a reasonable person in Champen's circumstances would have considered the police officer's request to be compulsory. Accordingly, we hold that Champen was seized and vacate the summary judgment for defendants on his Fourth Amendment claim.

▪ Jean Cantave avers that he was driving in Oneonta when he was pulled over by a police car with a siren and flashing lights. Cantave was ordered out of the car and instructed to place his hands on top of the car. The Supreme Court has

---

10. The district court denied defendants' motions to dismiss or for summary judgment with respect to the Fourth Amendment claims of plaintiffs Jennings, Quinones and Plaskett.

These plaintiffs later discontinued their Fourth Amendment actions by stipulation, and so their claims are no longer part of the case.

stated that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Under *Whren,* we have no doubt that Cantave was seized, and accordingly we vacate the summary judgment for defendants on Cantave's claim.

 Ricky Brown's affidavit states that three police officers stopped him on the street. The police officers questioned him about whether he was a student and where he had been. They asked for his identification card, passed it around, and returned it to Brown. At one point, the officers "formed a circle around" Brown. When Brown asked if he had permission to leave, they told him that he was free to go. When Brown started to leave, however, one officer told him to come back and asked to see his hands. We conclude that a reasonable person in Brown's position—directed to return by one of the police officers who, just moments before, had encircled him—would not have felt free to leave. We therefore vacate the district court's grant of summary judgment on Brown's claim.

 Sheryl Champen alleges that a police officer approached her at a bus station and told her that if she wanted to board the bus for which she was waiting, she would have to produce some identification. This contact is plainly a seizure under the caselaw because the police officer made it clear that he was detaining her. Accordingly, we vacate the summary judgment for defendants on Sheryl Champen's claim.

 Raishawn Morris alleges that he encountered two police officers in his dorm lobby, and that they asked him to show them his hands. This does not rise to the level of a seizure, and we affirm the summary judgment for defendants on Morris's claim.

Finally, we also affirm the district court's dismissal of the remaining Fourth Amendment claims. The other plaintiffs did not submit any affidavits describing the details of their contacts with defendants, and the complaint fails to allege facts stating a claim that they were seized by defendants. *See Sheppard v. Beerman,* 18 F.3d 147, 153 (2d Cir.1994).

IV. *Claims Under §§ 1985(3) & 1986*

 Plaintiffs also asserted causes of action under 42 U.S.C. §§ 1985(3) and 1986. The elements of a claim under § 1985(3) are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, . . .; (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States." *Mian,* 7 F.3d at 1087. The conspiracy must be motivated by racial animus. *See id.* at 1088. Because a claim under § 1985(3) requires proof of discriminatory racial animus, we affirm the district court's dismissal of plaintiffs' § 1985(3) claims for the same reasons that we dismissed plaintiffs' equal protection and § 1981 claims, discussed in detail above. And because "a § 1986 claim must be predicated on a valid § 1985 claim," *id.,* plaintiffs' § 1986 claim was properly dismissed as well.

**CONCLUSION**

We affirm the dismissal of plaintiffs' § 1983 claims under the Equal Protection Clause. We also affirm the dismissal of plaintiffs' claims under §§ 1981, 1985(3) and 1986. With regard to the plaintiffs' § 1983 claims under the Fourth Amendment, we affirm the district court's dismissal of these claims except those of plaintiffs Jamel Champen, Jean Cantave, Ricky Brown and Sheryl Champen. We vacate the district court's grant of summary judgment on those claims, and remand the case to the district court for further proceedings. Jamel Champen, Jean Cantave, Ricky Brown, and Sheryl Champen may continue to litigate their § 1983 claims of Fourth Amendment viola-

tions against all law enforcement defendants except Redmond and Olsen, against whom their claims were previously dismissed.

Affirmed in part, vacated in part, and remanded. Each party shall bear its own costs.