Moshe **ADLER**, Reizel Adler, David Goldberger, Rachel Goldberger, Shaindi Goldberger, Zvi Goldberger, Aron Ehrenfeld, Rachel Ehrenfeld, Chaya Einhorn, Chaim Einhorn, Menachem Feuerstein, Goldie Feuerstein, Nathan Fisch, Rachel Fisch, Solomon Miller, Esther Miller, Rose Goldberger–Stuhl, Moses Stuhl, David Schenker, Rachel Schenker, Judy Noe–Grunwald, Mattis Hollander, Chana Hollander, Chaya Berkowitz–Stern, Mendel Stern, Leopold Strulovitch, Blimie Strulovitch, Eliezer Zafir, Frady Zafir, Chaim Zorger and Bella Zorger, Plaintiffs,

v.

**KENT VILLAGE HOUSING COMPANY, INC.**, a/k/a Roberto Clemente Plaza, Robert E. Paul, the City of New York Department of Housing Preservation and Development, Richard T. Roberts, individually and as Commissioner of the City of New York Department of Housing Preservation and Development, Robin Weinstein, individually and as an Assistant Commissioner of the City of New York Department of Housing Preservation and Development, and Julie C. Walpert individually and as Assistant Commissioner of the City of New York Department of Housing Preservation and Development, Defendants.

No. 99–CV–1035(FB).

United States District Court, E.D. New York.

Nov. 21, 2000.

David J. Berger, Tenenbaum Dunbar Saltiel & Berger LLP, Brooklyn, NY, for Plaintiffs.

Kent Village Housing Company, Inc., a/k/a, and Robert E. Paul: Joseph Delman, Whitehorn & Delman, New York City, City of New York Department of Housing, Preservation and Development, Richard T. Roberts, Robin Weinstein and Julie C. Walpert, Michael D. Hess, Corporation Counsel of the City of New York, by Lawrence S. Kahn, Debra A. Hochman, Assistant Corporation Counsel, New York City, for Defendants.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

Plaintiffs, thirty-one occupants of fifteen apartments at Robert Clemente Plaza ("Clemente Plaza"), brought suit advancing in their complaint eleven claims for violations of federal, state and municipal law alleging on various theories that defendants seek to wrongfully abrogate plaintiffs' leases, and have targeted them for eviction because they are Jewish. Specifically, the First, Second, Third and Fourth claims allege that defendants' administrative review of plaintiffs' leases violates their federal constitutional right to due process. The Fifth claim alleges that defendants targeted Jewish residents for review of their leases in violation of their federal constitutional right to equal protection. Plaintiffs' due process and equal protection claims are also the underlying bases for their Ninth and Tenth claims, which respectively allege violations of 42 U.S.C. § 1983 ("§ 1983")[1] and 42 U.S.C. § 2000d.[2] The Sixth, Seventh and Eighth

---

1. In pertinent part, § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. Commonly known as Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

claims respectively allege violations of N.Y. Civ. Rights Law §§ 18–a, 18–c, N.Y. Exec. Law § 296, and N.Y. City Admin. Code title 8.[3] Plaintiffs' Eleventh Claim alleges state common law detrimental reliance and estoppel. Plaintiffs' seek permanent injunctive and declaratory relief barring defendants from reviewing plaintiffs' leases, monetary damages, costs and attorneys' fees.

All plaintiffs have brought on a motion seeking a preliminary injunction prohibiting defendants from pursuing administrative review of plaintiffs' leases.[4] Plaintiffs Menacham and Goldie Feuerstein (the "Feuersteins") have brought a separate motion seeking preliminary injunctive relief requiring defendants to transfer the Feuersteins to a larger apartment in Clemente Village. Defendants New York City Department of Housing Preservation and Development ("HPD"), HPD commissioner Richard T. Roberts ("Roberts"), HPD assistant commissioners Robin Weinstein ("Weinstein") and Julie C. Walpert ("Walpert") (collectively the "Municipal Defendants"), Kent Village Housing Co.,

Inc. ("Kent Village") and Kent Village assistant secretary Robert E. Paul ("Paul") have opposed both applications for preliminary injunctions, and have cross-moved for summary judgment on all claims.[5]

The Court heard oral argument on all the motions on October 24, 2000. Following oral argument, and for the reasons stated on the record in open court on that date, the Court granted summary judgment dismissing without prejudice plaintiffs' due process claims (the First, Second, Third, Fourth and relevant portions of the Ninth and Tenth claims) on the jurisdictional ground that they were unripe for review. *See Marchi v. Board of Cooperative Educ. Servs.,* 173 F.3d 469, 478 (2d Cir.) ("ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts" (quotation omitted)), *cert. denied,* 528 U.S. 869, 120 S.Ct. 169, 145 L.Ed.2d 143 (1999); *see also* Tr.[6] at 24–31. The Court reached this conclusion because plaintiffs had yet to suffer concrete harm since plaintiffs might well prevail in the administrative review process.[7] In addi-

---

**3.** These state and municipal discrimination claims rely on the same factual allegations that underlie plaintiffs' federal due process and equal protection claims.

**4.** Plaintiffs originally brought this action by order to show cause in State Supreme Court, Kings County. On January 28, 1999, that court temporarily enjoined defendants from proceeding with administrative review. Defendants thereafter removed the action to this Court and the parties stipulated to an extension of the temporary injunction until the Court determines the motion.

**5.** Although they have not filed any papers, defendants Kent Village and Paul indicated in a letter to the Court and at oral argument that they join in the papers submitted by the other defendants. *See* Ltr. to Ct. of Joseph Delman, Esq., Aug. 9, 1999, at 1–2.

**6.** "Tr." refers to the bound transcript of oral argument before the Court on October 24, 2000.

**7.** As the Court observed at oral argument, a final determination by HPD that plaintiffs have improperly succeeded to leases is a "nebulous future event[ ] so contingent in na-

ture that there is no certainty that [it] will ever occur, [accordingly] the case is not ripe for adjudication." *Thomas v. City of New York,* 143 F.3d 31, 34 (2d Cir.1998); *see also Narumanchi v. Board of Trustees of Conn. St. Univ.,* 850 F.2d 70, 72 (2d Cir.1988) (plaintiff's failure to submit to administrative procedures "precludes consideration of the fairness of those procedures in practice"); *Scheiner v. New York City Health & Hosps. Corp.,* No. 98 Civ. 8330(JGK), 1999 WL 771383, at \*9 n. 3 (S.D.N.Y. Sept. 28, 1999) (discussing *Narumanchi* ); *Thorpe v. Housing Auth. of City of Durham,* 393 U.S. 268, 284 n. 49, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) ("it would be . . . premature for us to reach a decision on petitioner's contention that it would violate due process for the Authority to evict her arbitrarily. That issue can be more appropriately considered if petitioner is in fact evicted arbitrarily"); *Midtown Sch. of Bus. v. Foley,* No. 90 CV 172, 1990 WL 21287, at \*8 (N.D.N.Y. Feb. 26, 1990) ("any challenge on due process grounds to the adequacy of the administrative hearing, yet to be held, is premature"); Tr. at 27.

tion, the Court relied on the strength of the representations by defendants that they would not attempt to remove plaintiffs from Clemente Plaza while administrative proceedings were pending, and that plaintiffs would be accorded full due process rights—namely, the right to be heard in a meaningful and timely fashion by presenting evidence, including calling and cross-examining witnesses, before an impartial hearing officer. *See* Tr. at 23, 30.

The Court's oral rulings consequently permitted defendants to proceed with administrative review of plaintiffs' leases. At the same time, the Court also denied the Feuerstein's application for preliminary injunctive relief for failure to show likely success on the merits, and on the representation by defendants that the Feuersteins would not be removed from their place on the Clemente Plaza apartment-transfer eligibility list, if at all, before administrative proceedings in respect to their lease were completed.

At oral argument, the Court reserved judgment on defendants' summary judgment motion regarding plaintiffs' equal protection (Fifth) claim and those parts of the § 1983 (Ninth) and Title VI (Tenth) claims predicated thereon. Implicitly, the Court reserved judgment on plaintiffs' state and municipal law claims (the Sixth, Seventh, Eighth and Eleventh claims). The Court now grants defendants' motion for summary judgment and dismisses with prejudice plaintiffs' equal protection claim (the Fifth Claim), and their § 1983 and Title VI claims (the Ninth and Tenth claims), insofar as they are based on this equal protection claim. In its discretion, the Court declines to exercise supplemental jurisdiction over plaintiffs' state and municipal law claims.

## BACKGROUND

The following facts are drawn from the Municipal Defendants' Statement Pursuant to Local Rule 56.1 ("Defs.' 56.1 Stmt."), Plaintiffs' Statement in Opposition Pursuant to Local Rule 56.1 ("Pls.' 56.1 Stmt."), Plaintiffs' Order to Show Cause, affidavits, declarations and exhibits attached to the foregoing, and the Verified Complaint. Except as otherwise noted, they are undisputed: Clemente Plaza is a Mitchell–Lama housing development in Williamsburg, Brooklyn, owned by Kent Village and subject to HPD supervision for management, financial and occupancy issues. Between 1990 and 1998, each plaintiff family entered into leases, countersigned by Kent Village, for apartments in Clemente Plaza. In the summer of 1998, defendants received from Kent Village notices seeking evidence verifying that their tenancies were in compliance with applicable regulations. The letters stated that failure to comply would result in referral of the matter to Kent Village's attorney for further action. By correspondence of July 31, 1998, August 5, 1998, and later dates, defendant Paul sent another letter to plaintiffs denying their applications for successor tenancies to the apartments they occupied and advising plaintiffs of their rights to appeal to HPD for documentary review. HPD later sent to plaintiffs another notice demanding final submission of any further documentation to substantiate their appeal. The letters sent to plaintiffs were the result of an audit, or review, of apartment occupancy at Clemente Plaza conducted by HPD.

Plaintiffs contend that these actions by Kent Village and HPD occurred without any participation by plaintiffs because plaintiffs believed that they had valid leases and therefore did not submit applications to Kent Village or HPD for succession rights. According to defendants, and disputed by plaintiffs, after receiving complaints in January and February 1998 from Clemente Plaza residents about vacant apartments, HPD ordered a recertification and application audit at Clemente Plaza employing the neutral criterion of comparing rent rolls from 1993 to those from 1997 to determine changes in heads of households. This examination revealed an unusually large number of changes in heads

of households not attributable to HPD-approved move-ins or transfers, and raised questions about successor tenancies. HPD ordered a full audit covering September 1993 to 1998 to review tenant recertification forms for Clemente Plaza's 532 units.

Plaintiffs also dispute defendants' assertion that HPD's audit, occurring in February 1998, found twenty-three instances in which tenant files contained no claim that a successor tenant was a family member or was within the definition of family member as required by HPD's rules, and three other instances in which documentation was missing for apartments. HPD also found that Kent Village violated applicable regulations by failing to submit tenant succession applications to HPD for approval. On July 1, 1998, Kent Village identified ten other units with questionable successor tenancies and forwarded additional documentation to HPD. In sum, of the thirty-six apartments with suspicious changes, twenty-nine were found to raise questionable successor tenancies, three successor tenancies were approved, and four presented no issue. Of the twenty-nine apartments with questionable successor tenancies, HPD asserts that at least six are occupied by persons whose surnames may be of African–American or Hispanic origin.[8]

There is no dispute, however, on the three facts that plaintiffs rely upon for their equal protection claim. First, plaintiffs argue, and defendants agree, that the review of apartment occupancy conducted by HPD occurred in two phases. The first phase was conducted by HPD and was described by HPD as "a 100% recertification audit." Defs.' 56.1 Stmt. ¶ 44; see Pls.' 56.1 Stmt., Declaration of David M. Berger, Esq. ("Berger Decl.") ¶ 7. This phase identified twenty-six apartments as having raised questionable successor leases. All of the occupants of the apartments

identified therein were Jewish. Later, despite the putative plenary coverage of the first phase audit, a second phase of auditing conducted by Kent Village occurred. HPD ordered this second phase in a letter dated June 23, 1998, instructing Kent Village to investigate and provide additional documentation on the twenty-three apartments identified and the three apartments with missing files, and "to provide the tenant files for any other apartments in which there was a successor tenancy." Defs.' 56.1 Stmt. ¶ 54; see Pls.' 56.1 Stmt., Berger Decl. ¶ 7. This second audit identified ten additional apartments with questionable successor tenancies. Six of these contained those occupants with possibly African–American or Hispanic surnames.

Second, there is agreement that a HPD-prepared memorandum dated June 19, 1998, concerning its first phase audit activities, expressly mentioned that successor occupants in certain apartments have Jewish surnames. See Pls.' 56.1 Stmt., Berger Decl. ¶ 10 & Ex. A; Defs.' 56.1 Stmt. ¶ 52 & Affidavit of Elaine Smith ("Smith Aff.") Ex. C. The memorandum states, in pertinent part, as follows:

> In 13 situations, [HPD] identified questionable succession practices in which a person (or persons) who appeared to be unrelated to the primary tenant resident was added to the recertification for two years.... In some cases, the original tenant has a Hispanic surname and in some cases a Jewish surname. However, in all cases, the second person who succeeded as the primary resident has a Jewish surname.

> In 6 situations [HPD] identified improper succession practices in which a person (or persons) who appeared to be unrelated to the primary tenant was added to the recertification for less than two years.... In some of these cases, the original tenant has a Hispanic surname and in some cases a Jewish surname. However, in all cases, the second person

8. The names are: Carmen Ubiles; Barbara Medina; Ruth Baldenko; Ruth Hernandez; Carmen Morales; and Pastora Sanchez.

who became the primary resident has a Jewish surname.

In 4 situations, [HPD] identified potential questionable succession practices in which unrelated people have been added to the income affidavit in the past year. . . . The additional member added to the recertification has a Jewish surname in all cases.

Pls.' 56.1 Stmt., Berger Decl. Ex. A; Defs.' 56.1 Stmt., Smith Aff. Ex. C.

Third, defendant Paul authored the letters from Kent Village denying plaintiffs' applications for successor tenancies and advising plaintiffs of their rights to appeal to HPD. Four of these invoked principles of Jewish law to explain why the occupants could not have entered into valid successor tenancies. Paul's July 31, 1998 letter to plaintiffs Leopold and Blimie Strulovitch (the "Strulovitches") explained why their application had been denied and recounted the history of their apartment's occupancy. It then stated:

It is a fair conclusion that Carmen Miranda and her mother [ (the "Mirandas") the original occupants of the apartment] vacated the apartment in February 1991, or earlier and turned it over to the newly married couple [the Strulovitches]. Leopold Strulovic [9] would not have been living with two unmarried females [the Mirandas] instead of his wife with whom he was conceiving children. Since the apartment has only one kitchen, it is a fair assumption that the laws of Kashruth would have prevented its use by both Ms. Miranda and Mr. Strulovic. Thus there was lacking one required interdependence of the tenant and the proposed successor as a well as the appearance on income affidavits for the requisite period before the tenant departed.

Affirmation of David Berger, Esq., in Support of Plaintiffs' Order to Show Cause ("Berger Aff.") Ex. C.

Paul's July 31, 1998 letter to plaintiffs Moshe and Reizel Adler (the "Adlers") contained similar language:

It is a fair conclusion that Yolanda Ayala and her daughter [the original occupants] vacated the apartment at or before the recertification of February 3, 1995, and turned it over to the Adlers. The laws of Kashruth would not have permitted the use of a single kitchen in the apartment by both families.

*Id.* Ex. G.

Likewise, Paul's August 5, 1998 letter to plaintiffs Aron and Rachel Ehrenfeld stated:

It is not credible that Aron Ehrenfeld was living with Mayra Ortiz and her daughter [the original occupants] in the subject apartment while his wife and infant son resided at 555 Bedford Avenue. It is not credible that Aron Ehrenfeld was living with an unmarried female instead of his wife and his infant son. Since the apartment has only one kitchen, the laws of Kashruth would have prevented its simultaneous use by Ehrenfeld and Ortiz.

*Id.* Ex. H.

In his July 31, 1998 letter to Chaim and Bella Zorger, Paul wrote:

It is a fair conclusion that Maria Flores Rivera and her daughters [the original occupants] vacated the apartment in 1994 and turned it over to Chaim Zorger. Mr. Zorger would not have been permitted to remain a student at his Academy ["the United Talmudic Academy, an Orthodox Jewish school of learning"] while living alone in the apartment of a then unmarried female. Since the apartment [has] only one kitchen, it is a fair assumption that the laws of Kashruth would have prevented its use by both occupants.

*Id.* Ex. Q.

## DISCUSSION

### I  Legal Standards

A court will grant a motion for summary judgment "if the record demonstrates that

---

**9.** The letter apparently misspells the Strulovitches' surname.

'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999) (quoting Fed.R.Civ.P. 56(c)); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All ambiguities must be resolved, and all inferences drawn, in favor of the non-moving party. *See D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). However, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico,* 132 F.3d at 149. *See also Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) ("conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment"). Generally, mere speculative allegations are insufficient to warrant a grant of discovery in the absence of "a complete lack of tangible proof," *Carney v. United States Dep't of Justice,* 19 F.3d 807, 813 (2d Cir.), *cert. denied,* 513 U.S. 823, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994), and cannot forestall summary judgment. *See Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 251 (2d Cir.1985) ("[a] bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment"). A judge's role in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ "The Equal Protection Clause of the Fourteenth Amendment directs that 'all persons similarly situated … be treated alike.'" *Lisa's Party,* 185 F.3d at 16 (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). One particular species of equal protection violation is a claim based on selective enforcement or prosecution of laws. *See United States v. Armstrong,* 517 U.S. 456, 464–65, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (selective prosecution); *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994) (selective enforcement). "In order to establish a violation of equal protection based on selective enforcement, the plaintiff must ordinarily show ' "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith to injure a person." ' " *Id.* (quoting *LaTrieste,* 40 F.3d at 590 (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir. 1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981))).

■ As for the first requirement, when a plaintiff attempts to prove selective enforcement "on the basis of his race, he 'must show that similarly situated individuals of a different race were not [subjected to the complained-of conduct].'" *Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir.2000) (citing *Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480). In other words, the plaintiff must show that similarly situated individuals of a different group were treated differently. One way in which plaintiffs can show discriminatory effect is through statistical evidence or studies comparing treatment of a group allegedly targeted for discrimination with treatment accorded similarly situated persons of other groups. *See Armstrong,* 517 U.S. at 469–70, 116 S.Ct. 1480. The Second Circuit has recognized an exception to this first requirement: When a plaintiff challenges "a law or policy that contains an express, racial classification … it is not necessary to plead the existence of a similarly situated

[member of a different] group." *Brown*, 221 F.3d at 337.

■ Regarding the second requirement, as with other types of equal protection claims, a plaintiff advancing a selective enforcement claim "must demonstrate that a discriminatory purpose was a 'motivating factor' in the government decision." *Estate of Rosenbaum v. City of New York*, 975 F.Supp. 206, 223 (E.D.N.Y.1997) (quoting *Village of Arlington Hts. v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); *accord Latrieste*, 188 F.3d at 69. "Discriminatory purpose implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of not merely in spite of its adverse effects upon an identifiable group." *Rosenbaum*, 975 F.Supp. at 223 (quotations and internal punctuation omitted) (citing *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).

■ In the equal protection context, courts generally must be cautious in granting summary judgment in discrimination cases. *See, e.g., Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998). The Second Circuit has made plain its intention in such instances to "reverse a grant of summary judgment if there is any evidence in the record from which a [fact finder] could draw a reasonable inference in favor of the nonmoving party on a material fact." *Id.* Nonetheless, summary judgment is appropriate in cases alleging equal protection violations where plaintiff's claims are premised upon "conjecture and speculation." *See, e.g., Lisa's Party*, 185 F.3d at 17 (selective enforcement claim); *Rodriguez v. Margotta*, 71 F.Supp.2d 289, 296 (S.D.N.Y.1999), *aff'd*, 225 F.3d 646 (2d Cir. 2000) (Table) (same); *Kerzer*, 156 F.3d at 400.

## II  Analysis

■ Here, although plaintiffs do not denominate it as such, they essentially allege a selective enforcement claim. Plaintiffs contend that the Municipal Defendants "specifically targeted Jewish tenants [for eviction] in their initial audit of Defendant Kent Village's records." Plaintiff's Reply Mem. of L. in Supp. of Mot. for Prelim. Inj. & in Opp'n to Defs.' Cross–Mot. for Summ. J. at 16. Plaintiffs further allege that in this treatment, "HPD specifically single[d] out ONLY Jewish tenants for review." Pls.' 56.1 Stmt., Berger Decl. ¶ 10 (emphasis in original). As plaintiffs' counsel explained at oral argument, "the reason" for this "is so [defendants] can clear up these apartments to put non-white tenants in these apartments, so that they can comply with their idea of what they're supposed to be doing under a 1992 consent decree" entered into by the parties to federal litigation entitled *Williamsburg Fair Hous. Comm. v. City of New York Hous. Auth.*, 76 Civ. 2125(RWS) (S.D.N.Y.). Tr. at 36.

Plaintiffs' contention is founded on the three undisputed facts discussed above: 1) that HPD's initial audit found only Jewish occupants to have questionable successor tenancies; 2) that an HPD memorandum mentioned that some successor occupants had "Jewish surnames"; and 3) that letters written by defendant Paul invoked principles of Jewish law to explain why occupants could not have validly succeeded to tenancies in certain apartments. Even when these facts are taken as true and construed in the light most favorable to plaintiffs, *see, e.g., D'Amico*, 132 F.3d at 149, it is clear that they fail to demonstrate an equal protection claim based on selective enforcement.

If plaintiffs were required only to prove the second selective enforcement requirement—that the selective treatment was based on plaintiffs' race or religion—their claim likely would survive summary judgment. All three key facts touch in some way on plaintiffs' Jewishness and it is possible that a fact finder could draw from the HPD audit results, the HPD memorandum and Kent Village letters the reasonable inference in plaintiffs' favor that defen-

dants challenged plaintiffs' leases at least in part because of their status as Jews. Unfortunately for plaintiffs, they also must contend with the first selective enforcement requirement—that similarly situated members of other groups were treated in a different manner. Here their case founders.

Plaintiffs cannot show that similarly situated individuals of different racial or religious groups were treated differently by defendants. *See Armstrong*, 517 U.S. at 469, 116 S.Ct. 1480. None of the three key facts—or any other fact—relied upon by plaintiffs shows that non-Jews, or non-whites for that matter, living in Clemente Plaza were not subjected to the same conduct about which plaintiffs complain. Nowhere do plaintiffs identify, as it seems they must, occupants of other apartments in Clemente Plaza who are members of other racial or religious groups, and whose occupancy was not reviewed by HPD to determine the validity of their tenancies. In fact, the HPD audit results themselves indicate that members of other racial groups received exactly the same treatment as plaintiffs.

Plaintiffs admit that in at least six instances occupants of apartments with surnames that could be African–American or Hispanic were found to have questionable successor tenancies. *See* Pls.' 56.1 Stmt., Berger Decl. ¶ 7. That these six were uncovered by Kent Village after the initial audit by HPD is of little import. HPD directed Kent Village, on June 23, 1998, to make the further examination that uncovered the six additional questionable tenancies and to provide to it files for other apartments in which a successor tenancy occurred. It was not until this second audit was completed that Kent Village sent to plaintiffs the letters authored by defendant Paul notifying them of the denial of their applications for successor tenancies and informing them of their right to appeal to HPD.

Because plaintiffs do not challenge a law or policy containing an express racial classification, their selective enforcement claim does not fit within the exception to the requirement that they show similarly situated persons of another group to have received different treatment. *See Brown*, 221 F.3d at 337. Without qualifying for the *Brown* exception and absent a showing—either through a statistical analysis or some other form of hard evidence, *see Armstrong*, 517 U.S. at 469–70, 116 S.Ct. 1480; *D'Amico*, 132 F.3d at 149—that similarly situated non-Jews or non-whites received different treatment, plaintiffs' contentions that they were targeted for eviction because of their race and religion amount to no more than "conjecture and speculation." *Lisa's Party*, 185 F.3d at 17. Such allegations are insufficient to support plaintiffs' selective enforcement claims. *See, e.g., id.* A fact finder would be unable to draw a reasonable inference in plaintiffs' favor from any of the material facts presented that members of other groups were treated in a manner different from plaintiffs. Accordingly, plaintiffs' equal protection claims cannot survive defendants' summary judgment motion.

## CONCLUSION

For the foregoing reasons, all of plaintiffs' federal claims based on due process violations (the First, Second, Third, Fourth and part of the Ninth and Tenth claims) are dismissed without prejudice. Those federal claims based on equal protection (the Fifth and the remainder of the Ninth and Tenth claims) are dismissed with prejudice.[10] With no federal claims

---

10. Defendants contend that summary judgment should be granted, *inter alia,* because individual defendants Roberts, Weinstein, and Walpert are entitled to qualified immunity. At oral argument, plaintiffs agreed to withdraw without prejudice all claims for all purposes against these defendants, subject to renewal of the claims should their due process claims ripen and should discovery indicate a valid basis for proceeding against the individual defendants. Accordingly, the Court need

remaining, the Court, in the exercise of discretion, declines to entertain plaintiffs' state and municipal law claims. *See* 28 U.S.C. § 1367(c). Principles of economy, convenience, fairness and comity are best served by remanding those claims (Sixth, Seventh, Eighth and Eleventh claims) to New York State Supreme Court, Kings County. *See Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir.1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendant state claims remain, the federal court should ordinarily dismiss the state claims. Where the state claims originally reached the federal forum by removal from a state court, the district court has the discretion to dismiss the claims without prejudice or remand them to the state court" (citation omitted).); *see also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("remand may best promote the values of economy, convenience, fairness and comity").

**SO ORDERED.**

not consider the issue of qualified immunity    at this time.