10-0702-cv
District Lodge 26 v. United Technologies Corp.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: June 9, 2010                                    Decided: July 8, 2010)

Docket No. 10-0702-cv

-------------------------------------

DISTRICT LODGE 26, INTERNATIONAL ASSOCIATION OF MACHINISTS &
AEROSPACE WORKERS, AFL-CIO,

Plaintiff-Appellee,

- v. -

UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY,

Defendant-Appellant.

-------------------------------------

Before:   MINER, SACK, and HALL, Circuit Judges.

Appeal from a judgment of the United States District Court for the District of Connecticut (Janet C. Hall, Judge). Following a bench trial, the district court issued a declaratory judgment to the effect that the defendant's announced plans to close two facilities in Connecticut and move the work performed at those facilities outside the State violated the collective bargaining agreement between the company and the plaintiff union. The district court issued a permanent injunction prohibiting the company from implementing the plans during the term of the collective bargaining agreement, which ends later this year.

Affirmed.

ALLAN B. TAYLOR (Steven M. Greenspan and Douglas W. Bartinik, on the brief), Day Pitney LLP, Hartford, CT, for Defendant-Appellant.

GREGG D. ADLER (Mary E. Kelly, on the brief), Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., Hartford, CT, for Plaintiff-Appellee.

RICHARD BLUMENTHAL, Attorney General of Connecticut, Hartford, CT, for amicus curiae State of Connecticut.

SACK, Circuit Judge:

The defendant-appellant United Technologies Corporation, Pratt & Whitney Division ("Pratt"), appeals from a February 18, 2010, declaratory judgment issued by the United States District Court for the District of Connecticut (Janet C. Hall, Judge) following a five-day bench trial. The court held that Pratt's announced plans to close two of its airplane engine overhaul and repair facilities in Connecticut and move the work performed at those facilities out of the State violated its currently-in-force collective bargaining agreement (the "CBA") with the plaintiff-appellee, District Lodge 26 of the International Association of Machinists and Aerospace Workers, AFL-CIO ("District Lodge" or the "Union"). The court enjoined the implementation of those plans during the remaining term of the CBA. The court concluded that the plans fail to comply with one of the thirty-four "Letters of Agreement" incorporated by reference in the CBA, "Letter 22," which requires Pratt to "make every reasonable effort to preserve" work performed by members of the Union, and which defines "every reasonable effort" to include

2

"pursuing actively and in good faith the goal of preserving the work" and assigning "extra value" in its decision-making to choices that would preserve the work.  Letter 22, at Section 2.

The district court based its conclusion that in developing and seeking to implement the closure plans, Pratt was not pursuing, in good faith, the goal of preserving work within the bargaining unit on a wide variety of factual findings, many of which are not challenged on appeal and none of which, we conclude, were clearly erroneous.  These findings include:  that Pratt exhibited an unwillingness to consider alternative plans that would not generate annual recurring savings through 2013; that it refused to measure savings under any metric other than earnings before interest and tax ("EBIT"); that it abandoned negotiations with the State of Connecticut, which hoped to persuade Pratt not to remove work from the State;[1] and that it failed to accord "extra value" to options that would avoid closing the Connecticut facilities in question before developing and proposing plans to do so.

The district court concluded that Pratt had not made, and was not making, "every reasonable effort" to preserve bargaining unit work as required by the CBA.  We find no error in the district court's application of the fact-intensive inquiry bargained for by the parties in Letter 22 or in the district court's determination that Pratt failed to pursue the goal of

---

[1]  The State participates in this appeal as amicus curiae.

preserving bargaining unit work in good faith. We therefore affirm the judgment.

**BACKGROUND**

Pratt, a division of United Technologies Corporation ("UTC"), engages in the design, manufacture, and sale of commercial and military aircraft engines. It also performs maintenance, repair, and overhaul of such equipment. It maintains several facilities in Connecticut, two of which are the focus of the present controversy: the Cheshire Engine Center ("Cheshire"), a site for overhaul and repair work, and the Connecticut Airfoils Repair Operations ("CARO"), a site for turbine airfoil repairs. District Lodge is the exclusive bargaining agent for employees at the two Connecticut facilities. It also represents other Pratt employees at other installations.

On December 3, 2007, Pratt and District Lodge entered into the CBA, which is effective, by its terms, until December 5, 2010. Pursuant to the CBA, District Lodge agreed that it would "not call or sanction any strike . . . during the period of [the CBA]." CBA art. 24. The CBA also provides that Pratt "will retain the sole right . . . to determine the number and location of its plants . . . [and] the assignment of all work to employees or other persons." Id. art. 1.

Article 27 of the CBA details the procedures that Pratt is required to follow before closing a facility or transferring a business unit governed by the CBA. Among other things, if Pratt announces a plan to close a facility, it is required to make

4

itself available to meet and confer with the Union about such a plan. See id. art. 27. Article 27 also provides, however, that "[t]he final decision regarding closing a plant or transferring a business unit rests solely with [Pratt]." Id. It is undisputed that Pratt has complied with the procedural requirements set forth in Article 27.

There are thirty-four "Letters of Agreement" incorporated into the CBA. One of these, Letter 22, is the focus of this action. It provides, inter alia: "[T]he Company [Pratt] will make every reasonable effort to preserve the work presently and normally manufactured by employees [covered by the CBA]." Letter 22 § 2(A). "[E]very reasonable effort" is further defined as:

> pursuing actively and in good faith the goal of preserving the work presently and normally manufactured by employees covered by [the CBA], while giving reasonable consideration to the Company's own interests, including the profitability of its operations. The Company will . . . assign extra value in its decision-making to choices that preserve such work in the bargaining unit. As part of any "meet and confer" process undertaken pursuant to Article 27, the Company will describe the efforts made to comply with this Letter and will provide the Union the opportunity to propose other reasonable efforts, including modifications to the collective bargaining agreement, which the Company will consider in good faith. In no event will "every reasonable effort" require the Company to make a capital investment, increase the size of the workplace, or require lower profits.

Id. § 2(b)(4).

Over the course of the past three years, Pratt has developed restructuring plans that contemplate the closure of

Cheshire and CARO. According to those plans, it would begin relocating work from Cheshire in 2010, and close the facility in 2011. It would also begin relocating work from CARO in 2010 and close that facility in the same year. Implementation of the plans would cost approximately 832 bargaining unit employees their jobs.

The closure plans for Cheshire and CARO evolved somewhat differently. Cheshire has historically performed less well than Pratt's other engine repair facilities. In July 2008, Pratt foresaw that the national economic downturn and the merger of Delta Airlines and Northwest Airlines would likely further worsen Cheshire's results beginning in early 2010.[2] The supervisor of the facility, Thomas Mayes, recommended to Pratt that Cheshire be closed and the work be transferred to a facility outside Connecticut. Pratt's President, David Hess, gave his support to the closure plan in or about January 2009. Pratt requested funding for the closure plan from its parent, UTC, on February 13, 2009. With the approval of UTC, Pratt announced the plan to the Union five months later, on July 21, 2009.

In arriving at his recommendation, Mayes considered three alternatives: closing the facility but transferring the work to another bargaining unit facility in Connecticut; reducing the number of product lines at Cheshire; and allowing volume to

---

[2] Pratt had a contract with Northwestern that was cancelled after the merger because Delta operates its own engine repair facility that would accommodate the Northwestern work done by Pratt.

reduce by attrition through non-renewal of customer contracts. He rejected all three, however, because they did not offer financial returns equivalent to those that would likely be achieved through closing the plant. In comparing the value of the closure plan to the value of the alternatives, Mayes did not assign extra monetary value to workforce preservation.

When Pratt presented the closure plan to UTC for approval, it also presented alternative programs that were projected to generate lower savings over a recurring period, but it did not pursue funding for any such program. In making that decision, Pratt did not assign extra monetary value to workforce preservation. It did represent to UTC, however, that one of its objectives was to avoid disruption to the workforce.

Before Pratt received approval for the closure plan and announced it to the Union, it implemented, at Mayes' insistence, various short-term measures at Cheshire that succeeded in making some improvement to its performance.

Pratt began considering a plan to close CARO in 2007, at which time the facility was performing poorly. Pratt's Vice-President of Global Repair Services, Tom Hutton, initially declined to pursue a closure option, in part because of the value he attached to work preservation. Drastic operational improvements at CARO were accomplished in 2008 by scaling down its operations. Nevertheless, in February 2009, Hutton recommended closing the facility, a move he estimated would yield approximately $20 million in annual recurring savings measured in

terms of EBIT.  Even after Hutton proposed the closure plan, Pratt made efforts to improve performance at CARO.

Pratt President Hess agreed with the proposal.  None of the decision-makers appears to have assigned "extra value" at this stage of the process to alternatives that would preserve bargaining unit work.  The closure plan was -- like the plan to close Cheshire -- presented to UTC for approval and funding in February 2009.  And -- also like the Cheshire plan -- Pratt announced it to the Union, with the approval of UTC, in July 2009.

The Union exercised its right under Article 27 to engage the company in a meet-and-confer process, during which the proposed closures of Cheshire and CARO were both discussed. Early in the process, Pratt informed the Union that the closure of the two facilities (together, the "Closure Plan") would yield $53.8 million in annual recurring savings.[3]  The $53.8 million figure, which was a product of calculations using the EBIT metric, did not reflect the fact that, because several of Pratt's facilities were joint ventures, Pratt would not realize the full value of the savings achieved through the Closure Plan.  It appears instead that approximately $13 million of the projected $53.8 million savings would be realized by Pratt's joint venture partners.

---

[3]  That forecast had in fact fluctuated widely in 2009.

8

Pratt also informed the Union that in order to persuade Pratt to keep the bargaining unit work in Connecticut, the Union would have to propose an alternative plan that would generate approximately $40 million in annual recurring EBIT savings. Pratt intended the difference between its $53.8 million figure and its $40 million demand on the Union to satisfy the requirement under Letter 22 of the CBA that it assign "extra value" to plans that preserve bargaining unit work.

The district court found that although Pratt used EBIT to calculate its $53.8 million savings, and insisted that any alternative plan proposed by the Union generate $40 million in annual recurring EBIT savings, Pratt has frequently used metrics other than EBIT to evaluate business plans. It has in the past, for example, measured the net present value of a business plan in terms of the cash savings it would generate.

Pratt and the Union exchanged several proposals during the meet-and-confer process. Pratt never offered or considered any proposal that was not projected to generate significant savings through at least 2013. And each of Pratt's proposals, including its last, best offer, would have required Union members who were unconnected with the two facilities in question to agree to a wage reduction.

Throughout the meet-and-confer process, the State of Connecticut consulted with both parties. It offered Pratt assistance that it valued at $20 million in savings per year for five years to keep the jobs in question in the State. Pratt

9

valued it at approximately $5 million annually. The difference in valuation was at least in large part a product of Pratt's use of the EBIT metric, i.e., the State's offer would have conferred on Pratt a yearly cash benefit that was greater than $5 million but would not have increased its EBIT by that amount. The State informed Pratt that it would be willing to provide an additional $10-12 million over five years and that Pratt should engage the State in further talks if it was close to an agreement with the Union. Pratt did not initiate further negotiations with the State.

On September 8, 2009, toward the end of the meet-and-confer process, two Pratt officials exchanged emails raising, but leaving unanswered, the question of what Pratt would do if the Union succeeded in proposing an alternative plan that would generate the target savings. The district court inferred from this exchange that at least some Pratt officials were not certain that Pratt would abandon the Closure Plan even if the Union identified an alternative way to generate savings on the scale that Pratt demanded.

The Union never did propose such an alternative plan, however. On September 21, 2009, shortly after the conclusion of the meet-and-confer process, Pratt informed the Union that it was proceeding with the Closure Plan. The Union filed a lawsuit the next day in the United States District Court for the District of Connecticut seeking to prevent Pratt from implementing the Closure Plan.

Following a five-day bench trial, the district court ruled in favor of the Union. See District Lodge 26 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt & Whitney, 689 F. Supp. 2d 219 (D. Conn. 2010) ("District Lodge"). The court concluded that the Closure Plan violated the requirement under Letter 22 that Pratt make every reasonable effort to preserve work within the bargaining unit. The court also found that the Closure Plan violated Pratt's implied covenant.

The district court found facts as rehearsed above. In determining that the Closure Plan was in breach of the CBA, it relied on, among other things, Pratt's refusal to consider an alternative plan that would not generate recurring annual savings through at least 2013; its refusal to measure savings under any metric other than EBIT, which the court found resulted in the overvaluation of the Closure Plan and the undervaluation of alternatives; its undervaluation of the State's proposal (also based on Pratt's refusal to look beyond EBIT savings); its failure to engage the State in negotiations to the extent offered by the State; and its failure to accord "extra value" to plans that would preserve work before the meet-and-confer process, by which time the Closure Plan had already been developed internally and proffered to the union. See id. passim.

In addition, in reaching its conclusion, the court took into account the September 8, 2009, emails between Pratt officials expressing doubt as to the possible consequences of an

11

alternative Union plan had it been able to generate the target savings. It also made note of two other emails. One was from the President of UTC indicating that he had already decided that he "[would] not support" a request from the State "not to go ahead with [the closure of] Cheshire" before the meet-and-confer process had concluded. Id. at 236. The other was from the chief human resources officer of UTC acknowledging that the assistance proposed by the State, which the State valued at $20 million, but Pratt valued at $5 million, may actually "benefit" Pratt "beyond the [$5 million]," but stating that he would "feel better if all there [was] for real savings [was] the [$5 million]." Id. at 235.

In determining that the Closure Plan was also in breach of the implied covenant of good faith and fair dealing, the district court reasoned that Pratt had "materially evaded the spirit of [the CBA]," which the court defined as Pratt's obligation to "make a good faith effort to preserve work within the bargaining unit" by "going through the motions of complying with Letter 22 without making any genuine effort to preserve work." Id. at 266.

The district court entered a declaratory judgment "that [Pratt's] announced plans to close [Cheshire and CARO], and to move the work performed at those facilities outside of the State of Connecticut constitutes a breach of Letter 22 . . . ." Accordingly, it issued a permanent injunction "prohibiting the defendant from implementing the restructuring plans . . . during

12

the term of the [CBA]."  District Lodge, No. 09 Civ. 1494, Judgment (Feb. 18, 2010) (Dkt. No. 72).

Pratt appeals.

**DISCUSSION**

I. Jurisdiction and Standard of Review

Section 301 of the Labor Management Relations Act "provides subject matter jurisdiction to the federal courts for suits involving violations of collective bargaining agreements." Baldracchi v. Pratt & Whitney Aircraft Div., United Techs. Corp., 814 F.2d 102, 104 (2d Cir. 1987).  "In cases where section 301 is the basis of jurisdiction, it also requires that courts apply federal common law to determine the meaning of the agreement." Id.  "While it is true that traditional contract rules do not always rigidly apply to collective bargaining agreements, courts must look to traditional state contract law, when it is not inconsistent with federal labor policy, to form the content of the federal common law governing labor agreements."  Local 377, RWDSU, UFCW v. 1864 Tenants Ass'n, No. 06 Civ. 1190, 2007 WL 634751, at *11, 2007 U.S. Dist. LEXIS 14766, at *37 (S.D.N.Y. Mar. 1, 2007), aff'd, 533 F.3d 98 (2d Cir. 2008) (per curiam); see also S. Air Crew Grp. v. S. Air, Inc., No. 3:08 Civ. 1115, 2008 WL 4642939, at *2, 2008 U.S. Dist. LEXIS 83601, at *6 (D. Conn. Oct. 20, 2008) ("In interpreting a collective bargaining agreement, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies."); cf. Bozetarnik v. Mahland, 195 F.3d 77 (2d Cir.

13

1999) (relying on cases from this Circuit and others to interpret a collective bargaining agreement).

"In reviewing a district court's decision in a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo." White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

II. Whether Pratt Breached Letter 22

A. The "Every Reasonable Effort" Clause

Letter 22 required Pratt to make "every reasonable effort" to preserve work within the bargaining unit. The parties agreed upon a definition of "every reasonable effort" that focused on an "active" and "good faith" pursuit of the goal of work-preservation. The question whether Pratt pursued the goal of work-preservation in good faith is one of fact. See Habetz v. Condon, 224 Conn. 231, 237 n.11, 618 A.2d 501, 505 n.11 (1992) ("It is the burden of the party asserting the lack of good faith to establish its existence and whether that burden has been satisfied in a particular case is a question of fact."); see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007) ("[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular

14

case, and is ordinarily a question of fact to be determined by the jury or other finder of fact."); cf. Songbird Jet Ltd., Inc. v. Amax, Inc., 581 F. Supp. 912, 925 (S.D.N.Y. 1984) ("[T]he corporate state of mind [is] a fact capable of ascertainment."); In re Motors Liquidation Co., No. 09 Civ. 7794, 2010 WL 1730802, at *7, 2010 U.S. Dist. LEXIS 41642, at *21 (S.D.N.Y. Apr. 28, 2010) ("The Bankruptcy Court's finding of good faith . . . is either a factual question or mixed question of fact and law that must be reviewed for clear error.").

Because the question of whether Pratt pursued the goal of work preservation in good faith is one of fact, we review for clear error the district court's conclusion, following a five-day bench trial at which the district court had the opportunity to review the evidence and observe witnesses first-hand, that Pratt's actions did not constitute "every reasonable effort" to preserve work within the bargaining unit.

We are not left with "the definite and firm conviction that a mistake [w]as . . . committed" by the district court in its findings of fact requiring us to overturn the district court's ruling in this regard. U.S. Gypsum, 333 U.S. at 395. Quite the contrary. The district court could easily infer from the facts outlined above that Pratt, in developing and seeking to implement the Closure Plan, was not pursuing in good faith the goal of preserving work within the bargaining unit.

15

### B.  Other Asserted Errors of Law

The central argument in Pratt's briefing, and the focus of its presentation at oral argument, was that the district court overstepped its bounds by faulting Pratt for refusing to consider any savings that came in non-EBIT form.  The district court found that Pratt's refusal to consider non-EBIT savings resulted in the undervaluation of alternative plans, including assistance offered by the State, and its insistence on measuring savings only under EBIT resulted in the overvaluation of the savings that could be achieved by the Closure Plan.

Pratt argues that its decision to value the Closure Plan and alternative plans exclusively in terms of their projected EBIT savings was a business decision to which the district court was required to defer.  "The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 124 (Del. Ch. 2009) (internal quotation marks omitted).

But it inheres in the nature of a contract relating to the business of a corporation -- a collective bargaining agreement included -- that to the extent set forth in the contract the corporation has surrendered the ability to act otherwise than according to its lawful obligations thereunder irrespective of the corporation's subsequent contrary "business

16

judgment." Each party fully exercises its business judgment by voluntarily entering into an agreement, thereby surrendering, to some extent, its free exercise thereof thereafter. Pratt cannot, then, by invoking the business judgment rule, effectively insulate from review whether it engaged in a good faith pursuit of work preservation by requiring that we defer to its method of accounting for its measures.

The valuation of the Closure Plan and its alternatives was plainly part of the calculus used by Pratt in determining whether to close the two Connecticut facilities. The means of that valuation are subject to review in determining whether Pratt's adoption of the Closure Plan was proper. The district court concluded that the adoption of the Closure Plan was improper. It supported that conclusion with its factual finding that Pratt has used metrics other than EBIT to evaluate business plans. And Pratt does not appear to contest the district court's finding that the consideration of savings other than in terms of EBIT may well have lowered the value of the Closure Plan and increased the value of various alternatives.

Pratt also argues that the district court should have deferred to its "business judgment" to consider only alternative proposals that would generate annual recurring savings at least through 2013. But again, it was contractually bound to use "every reasonable effort" to preserve work within the bargaining unit. Pratt cannot invoke the business judgment rule to argue that under the contract the sufficiency of the effort must be

17

judged on the basis of recurrent savings for three years. The contract neither says nor implies as much.

Pratt contends that the district court erred in attempting to judge its "subjective intent," complaining that the court effectively required it to "think good thoughts" about preserving work within the bargaining unit. Appellant's Br. at 54; see also Koufakis v. Carvel, 425 F.2d 892, 906 (2d Cir. 1970) ("A breach is a breach; it is of marginal relevance what motivations led to it."). But the district court did not decide whether Pratt's thoughts were good or evil or, in the abstract, whether Pratt's motivation for doing what it did was benevolent. The court analyzed Pratt's subjective intent because Letter 22 bound it to operate with the good faith pursuit of bargaining unit work. Pratt's subjective intent, insofar as it failed to pursue "in good faith" the goal of preserving work for its Connecticut employees, was the violation of the CBA.

The district court did not, moreover, decide whether Pratt wanted to keep the Connecticut facilities open. Indeed, it is clear, but not determinative of whether Pratt breached the CBA, that Pratt wanted to move the operations and attendant employment in question elsewhere for economic reasons. The question, as the district court recognized, was whether Pratt made a genuine effort to keep the work at issue within the bargaining unit as it was contractually bound to do, whether it wanted to or not.

18

Pratt argues that the improvements it made to Cheshire and CARO before the Closure Plan gained traction unambiguously demonstrate such an effort, but Pratt has identified no basis in law for rejecting the district court's finding that such improvements, viewed together with the other factual circumstances, did not require an overall finding of a good faith pursuit of work preservation. Pratt's decision to make short-term operational improvements to the Connecticut facilities in 2008 was not inconsistent with an unwillingness to attempt in good faith to keep the facilities open in 2010.

The district court relied, in part, on emails from Pratt and UTC executives to determine whether Pratt was pursuing the goal of work preservation in good faith. That was not an improper method for attempting to gauge corporate intent. "[C]orporate intent is shown by the actions and statements of the officers, directors, and employees who are in positions of authority or have apparent authority to make policy for the corporation." United States v. Basic Constr. Co., 711 F.2d 570, 573 (4th Cir. 1983). The emails discussed by the district court were sent by officers at Pratt and UTC, including the President of UTC. Nowhere in its briefing does Pratt dispute that these officers were in positions of authority at Pratt or, in the case of the UTC officers, had the authority to make policy that would be binding on Pratt. In any event, the emails discussed by the district court constitute only a small portion of its analysis,

19

and the district court's conclusion was independently supported by the other evidence it discussed.

Finally, Pratt argues that the district court erred in finding that Letter 22 required it to accord extra value to options that would preserve work within the bargaining unit before the meet-and-confer process began. The district court based its finding on a close reading of the language of the contract: Letter 22 set forth the "extra value" requirement before describing the meet-and-confer process, during which Pratt was to describe to the Union the efforts it had already made to comply with Letter 22.

This was a reasonable interpretation of Letter 22. Pratt has persuasively argued that the contract was ambiguous as to when the extra value had to be assigned.[4] "Whether [] contractual language is ambiguous is [] a question of law subject to our de novo review." Aon Fin. Prods., Inc. v. Sociètè Gènèrale, 476 F.3d 90, 95 (2d Cir. 2007). "If the language of a contract is susceptible to more than one reasonable interpretation, [] the contract is ambiguous." 19 Perry St., LLC v. Unionville Water Co., 294 Conn. 611, 623, 987 A.2d 1009, 1018 (2010) (internal quotation marks omitted; alterations incorporated); In re Holocaust Victim Assets Litig., 282 F.3d

---

[4] Indeed, the contract was also ambiguous as to how extra value was to be assigned at all, because the extra value provision was followed by a provision to the effect that Pratt was not required to accept lower profits. However, Pratt does not dispute the district court's finding that Letter 22 required extra value to be assigned to proposals that would further the goal of work preservation.

103, 108 (2d Cir. 2002). But the interpretation of an ambiguous contract provision is a question for the finder of fact that we review for clear error. See Tobet v. Tobet, 119 Conn. App. 63, 68, 986 A.2d 329, 333 (Conn. App. Ct. 2010); In Time Prods., Ltd. v. Toy Biz, Inc., 38 F.3d 660, 665 (2d Cir. 1994). The district court's interpretation of Letter 22, well-grounded in its text and the circumstances under which it was drafted, was not clearly erroneous.

## III. Whether Pratt Violated the Implied Covenant of Good Faith and Fair Dealing

The actual declaratory judgment issued by the court referred only to Pratt's breach of the CBA and not to any violation of the implied covenant of good faith and fair dealing. But the district court did find, in the course of its opinion, that the Closure Plan violated Pratt's implied covenant of good faith and fair dealing.

There is an implied covenant of good faith and fair dealing in every contract. See, e.g., Magnan v. Anaconda Indus., Inc., 193 Conn. 558, 566, 479 A.2d 781, 785-86 (1984); cf. 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 135, 773 N.E.2d 496, 500 (2002) (New York law). However, in general, "[i]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." Hall v. EarthLink Network, Inc., 396 F.3d 500, 508 (2d

21

Cir. 2005) (internal quotation marks omitted) (California law); see also Deer Park Enters., LLC v. Ail Sys., Inc., 57 A.D.3d 711, 712, 870 N.Y.S.2d 89, 90 (2d Dep't 2008) ("A cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of contract." (internal quotation marks omitted)) (New York law); Monahan v. GMAC Mortg. Corp., 179 Vt. 167, 187 n.5, 893 A.2d 298, 316 n.5 (2005) ("[W]e will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract based upon the same conduct." (emphasis in original)) (Vermont law); but see Gen. Clutch Corp. v. Lowry, 10 F. Supp. 2d 124, 133-34 (D. Conn. 1998) (upholding, as non-overlapping, separate jury awards of damages for breach of employment agreement and breach of implied covenant of good faith and fair dealing, based on "the same factual evidence" or "conduct evidence").

We need not decide whether the district court's finding of a breach of the implied covenant of good faith and fair dealing by Pratt was clearly erroneous as a matter of fact or mistaken as a matter of law. The declaratory judgment, as noted, made no mention of any breach of the implied covenant. It was explicitly based on the district court's finding as to the breach of contract claim. We conclude that the declaratory judgment and the injunction issued by the district court were amply supported

22

by the court's finding that Pratt's Closure Plan breached Letter 22 of the CBA. We therefore affirm the judgment on that basis without reaching the assertions as to the implied covenant of good faith and fair dealing.

**CONCLUSION**

For the reasons set forth above, the judgment of the district court is affirmed.