Abdelgadir **ABOEID,** Mona Abdelgadir and Abdelgadir Aboeid on Behalf of his Seven Minor Children, Plaintiffs,

v.

**SAUDI ARABIAN AIRLINES CORPORATION,** Defendant.

**No. 10–CV–2518 (WFK)(VVP).**

United States District Court, E.D. New York.

Aug. 9, 2013.

Thatcher A. Stone, New York, NY, for Plaintiffs.

Allison M. Surcouf, Bartholomew Banino, Stephen J. Fearon, Condon & Forsyth LLP, New York, NY, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM F. KUNTZ, II, District Judge.

Abdelgadir Aboeid ("Mr. Aboeid"), his wife Mona Abdelgadir ("Mrs. Abdelgadir"), and Mr. Aboeid on behalf of their seven minor children (collectively, "Plaintiffs" or "the Aboeid family") commenced this action against Saudi Arabian Airlines Corporation ("Defendant" or "Saudi Airlines"). This action arises from a series of events beginning with Defendant's allegedly discriminatory treatment of the Aboeid family at John F. Kennedy International Airport ("JFK"), prior to their departing flight from the United States, and ending with the family being stranded in Saudi Arabia for more than one week after missing their return flight back to the United States. Plaintiffs seek recovery on four causes of action: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) violation of their civil rights under 42 U.S.C. § 1981 ("Section 1981"), and (4) violation of their civil rights under N.Y. Executive Law § 296 (the "New York Human Rights Law" or the "NYHRL").

This Court conducted a four-day bench trial in accordance with 28 U.S.C. § 1330(a). Having reviewed the testimony and exhibits, as well as the parties' post-trial submissions, this Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following Findings of Fact and Conclusions of Law. For the reasons set forth below, this Court finds Defendant not liable on each of Plaintiffs' four causes of action.

## I. Findings of Fact

### A. The Plaintiffs' Departing Flight

On February 21, 2008, Plaintiffs purchased nine roundtrip electronic tickets aboard Saudi Airlines for travel from JFK to Khartoum, Sudan, with layovers in Saudi Arabia on both the departure and return flights. Ex. 3–A ("Plaintiffs' Tickets"). The Plaintiffs' trip was scheduled to begin from JFK on June 7, 2008, with the departure layover in Riyadh, Saudi Arabia, and to return to JFK on July 24, 2008, with the return layover in Jeddah, Saudi Arabia. *Id.* Plaintiffs purchased their electronic tickets through a travel agency in North Carolina, where Plaintiffs reside. Tr. 44:6–7, 46:13–14. The tickets were non-refundable, non-endorsable, and non-transferable. Ex. 3–A; Tr. 271:10–13, 271:25–272:3, 282:8–23. Saudi Airlines' seating policy was to assign seats on a first-come, first-served basis. Tr. 516:18–517:5. One of the terms and conditions of Plaintiffs' tickets was that Plaintiffs must arrive at the airport "early enough to complete departure procedures." *Id.* at 223:25–224:20, 405:20–406:13; Ex. 3–C ("Saudi Arabian Airlines Terms, Conditions, Passenger Advice, Notices and Liability Limitations").

On June 7, 2008, Plaintiffs arrived at Terminal One at JFK, intending to board Saudi Airlines Flight SV 22, scheduled to depart at 2:00 PM. Tr. 49:24–50:4, 115:24–116:18; Ex. 3–A. The Aboeid family arrived in a van that they had rented in Greensboro, North Carolina, and driven from Greensboro to JFK. Tr. 50:5–14. The Aboeid family arrived at Terminal One on June 7, 2008 at approximately noon. *Id.* at 114:8–116:6; *see also* Ex. 27 ("Deposition of Abdelgadir Aboeid" or "Abdelgadir Dep. Tr.") at 20:17–25. After arriving at Terminal One, the family disembarked from the van and entered the terminal with sixteen to eighteen pieces of

luggage that they intended to check on the flight from JFK to Riyadh. Tr. at 52:15–53:3, 53:20–21; *see also* Abdelgadir Dep. Tr. at 21:21–22:6; Ex. I–1 ("Saudi Airlines Flight SV 22 Boarding Data").

After dropping off his wife, children, and the baggage at Terminal One, Mr. Aboeid asked a taxi driver to lead him from Terminal One to the National Car Rental return facility at JFK. Tr. 52:23–53:3, 53:22–54:2. Mr. Aboeid, following the taxi, then drove the van to the rental car return facility. *Id.* at 53:22–54:16. Mr. Aboeid returned the rental van to National Car Rental at 12:25 P.M. *See* Ex. K ("National Rental Car Receipt"); *see also* Tr. 119:16–120:10, 120:12–121:3. After leaving the van at the National Car Rental facility, Mr. Aboeid rode in the taxi back to Terminal One, where he rejoined his family in the vicinity of the Saudi Airlines check-in area sometime after 12:30 P.M. Tr. 56:22–57:5, 463:19–464:1, 469:15–19.

When the Aboeid family reached the check-in counter, Mr. Aboeid handed the family's passports and ticket receipts to the check-in agent. Tr. 58:6–22. Rather than check in the Aboeid family for their flight, the check-in agent asked the family to exit the line and wait by the side. *Id.* at 59:5–15. The family then moved to the side with their luggage and waited for some period of time.[1] *Id.* at 59:16–60:2, 129:12–17. As Plaintiffs waited off to the side, passengers who had been standing in line behind the Aboeid family checked in without incident. *Id.* at 59:22–24. Ultimately, Plaintiffs were among the last of the passengers to be checked in and board the flight. *Id.* at 60:3–8.

Plaintiffs were the only black passengers waiting in line to check in for Saudi Airlines Flight SV 22. *Id.* at 64:9–11. Plaintiffs believe they were asked to exit the line and wait by the side because of their race. *Id.* at 64:2–8, 64:17–65:20. Plaintiffs claim a Saudi Airlines employee, Taher Abdullah, walked by several times to "make sure [the Aboeid family] didn't go back to the line." *Id.* at 126:25–127:8, 161:16–25.

At some point, Plaintiffs' sixteen to eighteen pieces of checked baggage were placed on a trolley and moved to the airplane. Tr. 61:18–22. Various defense witnesses described Saudi Airlines' normal procedure for weighing baggage, whether for individual travelers or large groups. *Id.* at 329:8–23, 349:17–351:3, 446:2–21; *see also* Ex. M ("Deposition of Sevan Jacoby" or "Jacoby Dep. Tr.") at 55:10–19, 56:14–25. One defense witness, Rennie Haradan, testified that even in the case of a large group with many bags, Saudi Airlines would weigh each bag individually rather than weigh them in bulk and assign each bag an average weight. Tr. 350:23–351:5. None of the defense witnesses testified they personally observed or otherwise knew Plaintiffs' bags were weighed during Plaintiffs' segregation from the check-in line. *See, e.g., id.* at 349:25–350:2. The weight of Plaintiffs' checked luggage was noted on the Passenger Manifest as "18/438," indicating their number and total weight—*i.e.,* eighteen pieces at 438 kilograms. *Id.* at 332:25–333:7; *see also* Ex. I–1.

Check-in for Flight SV 22 "closed" at 1:00 P.M. on June 7, 2008, one hour prior to the scheduled departure time of 2:00 P.M. *Id.* at 398:1–25, 399:16–400:2, 403:2–8, 451:22–454:8; *see also* Ex. 4–1 ("Passenger Services Procedures Manual"), at Section 9–6–1, ¶ (B)(b)(3). The "closing" of a flight normally means that no passengers who arrive at the check-in desk after that time

---

1. Although Plaintiffs testified they were made to wait for more than two hours, the Court concludes Plaintiffs were made to wait no more than one and a half hours, given Mr. Aboeid rejoined his family after 12:30 P.M. for a flight that departed around 2:00 P.M.

will be issued boarding passes. Tr. 269:20–270:8; *see also* Ex. L ("Deposition of Sami Baqader" or "Baqader Dep. Tr.") at 90:8–91:17. A flight may, however, be "reopened" at the airline's discretion to accommodate late-arriving passengers if issuing such passengers boarding passes after the flight has "closed" will not jeopardize the timely departure of the flight. Tr. 501:23–502:4. The Aboeid family eventually received boarding passes, proceeded through airport security and passport control, reached the departure gate, and boarded Flight SV 22 without incident. *Id.* at 61:23–62:2, 65:23–25.

Though the Aboeid family wished to sit in a three-by-three block of seats on Flight SV 22, at no time prior to June 7, 2008 had any member of the Aboeid family requested particular seats on the aircraft, nor did any member of the Aboeid family make such a request when they checked in at Terminal One on June 7, 2008. *Id.* at 60:19–22, 158:23–159:3, 531:19–23. The aircraft utilized for Flight SV 22 was a Boeing 747, which had 290 economy class seats, including ninety-five economy class seats that were empty on June 7, 2008. *Id.* 340:11–22; Ex. I–1. Mr. Aboeid's wife and seven children, including an infant, sat in Row 37 in seats A through F and H, while Mr. Aboeid sat in Row 59, seat L. Tr. 337:22–338:1, 461:18–462:15; *see also* Ex. I–1. Though Mr. Aboeid was seated in a different section of the plane, Plaintiffs were free to move about the economy class cabin as they wished and utilize any of the empty seats in that section of the aircraft. Tr. 66:10–67:2, 340:23–341:2.

### B. The Plaintiffs' Return Flight

On July 24, 2008, Plaintiffs arrived at King Abdulaziz International Airport ("JED") in Jeddah, Saudi Arabia for the return leg of their trip, intending to board Saudi Airlines Flight SV 21, departing at 2:20 A.M. to JFK. Tr. 71:18–72:1. 134:24–135:13, 244:13–15; *see also* Ex. 3–A. Passengers are advised at the time of reservation, by either Saudi Airlines or their travel agent, to arrive at the check-in desk four hours prior to the scheduled time of departure and that the flight will close one hour before departure. Tr. 405:20–407:1. When passengers purchase their tickets on Saudi Airlines electronically, they are advised of these times in the online terms and conditions attached to the tickets. *Id.* at 406:7–13.

The Aboeid family arrived at JED at approximately midnight on July 24, 2008. Tr. 72:17–18, 76:8–10. In 2008, signs were displayed in JED in English and Arabic to direct passengers to the appropriate departure check-in areas. *Id.* at 497:1–498:20; *see also* Jacoby Dep. Tr. at 89:16–25, 122:4–12; Baqader Dep. Tr. at 81:9–13 ("Q: When you arrive at the departure area for Saudi Arabian Airlines' flights to New York, are there television monitors that show flights and gates? A: Yes."). After taking about ten to fifteen minutes to locate the departures floor, the Aboeid family waited in a line for approximately one hour. Tr. at 76:15–22, 138:1–9. Plaintiffs asked several Saudi Airlines employees for help locating the correct check-in desk. *Id.* at 74:12–20, 193:8–16. However, the employees refused to help Plaintiffs. *Id.* at 74:16–23, 193:8–16. At around 1:00 A.M., the Aboeid family left the line, which was not moving, and entered a different line. *Id.* at 76:21–77:6. The Aboeid family waited about fifteen minutes in this second line before being told by a customer service representative that they were not in the correct line to check in for Saudi Airlines Flight SV 21 to JFK. *Id.* at 77:18–25. Check-in for Saudi Airlines Flight SV 21 closed at 1:20 A.M., one hour before the flight was scheduled to depart. *Id.* at 476:8–13.

Sometime between 1:20 A.M. and 1:40 A.M., the Aboeid family entered the cor-

rect line to check in for Saudi Airlines Flight SV 21. *See* Tr. 77:18–78:3. There were several passengers ahead of them when Plaintiffs finally arrived at the correct line. *Id.* at 78:7–11. When the Aboeid family reached the front of the line, a Saudi Airlines employee told Mr. Aboeid that he and his family could not be accommodated on Flight SV 21. *Id.* at 78:21–79:6. The Aboeid family attempted to check in for Flight SV 21 after the flight had closed.[2] *Id.* at 200:1–10, 476:8–13; *see also* Baqader Dep. Tr. at 53:15–54:5. Given Plaintiffs' failure to arrive at the check-in desk before the flight closed, Plaintiffs were classified as "no-shows" for Saudi Airlines Flight SV 21. Tr. 274:1–6, 391:13–392:2, 397:15–18.

Flight SV 21 departed from JED without the Aboeid family but with thirty-two "non-revenue" passengers and three empty economy seats. *Id.* at 265:4–6, 265:19–21, 395:21–23; *see also* Baqader Dep. Tr. at 86:2–13. "Non-revenue" passengers may include passengers with confirmed reservations as well as stand-by passengers who travel on a space-available basis. Tr. 284:19–25. Although Flight SV 21 was "overbooked," it was not "oversold" because about fifty passengers with confirmed reservations were classified as "no-shows." *Id.* at 265:10–17. Pursuant to Saudi Airlines' Passenger Services Procedures Manual, Saudi Airlines staff are not permitted to offload a stand-by passenger who has been given a boarding pass to accommodate a late-arriving confirmed passenger after the flight has closed. *Id.* at 268:24–269:5, 385:10–25, 477:15–478:1; *see also* Passenger Services Procedures Manual at Section 4–8–2, ¶ (D)(3).

Where Saudi Airlines decides not to board a confirmed passenger, the airline's obligations to that passenger are governed by "denied boarding" rules. Tr. 248:20–25. If a passenger is eligible for denied boarding compensation, Saudi Airlines will provide the passenger with hotel accommodations, meals, rescheduling on another flight at no added expense to the passenger, and means of communicating with friends or family. Baqader Dep. Tr. at 96:4–22; *see also* Tr. 248:20–249:11. A passenger must timely arrive to check in for a flight to qualify for denied boarding compensation. Tr. at 267:4–20.

### C. Plaintiffs' Attempts to Return Home

In 2008, Saudi Airlines operated just two flights a week from JED to JFK. Tr. 389:19–23, 511:14–19. Despite Plaintiffs having arrived after check-in for Flight SV 21 had closed, and despite the fact that Plaintiffs' tickets were marked non-endorsable and non-refundable, Saudi Airlines offered to reroute Plaintiffs free of charge to London or Paris, where Plaintiffs would be responsible for purchasing tickets for transportation on another carrier operating from one of those cities to JFK. *Id.* at 81:16–23, 145:20–146:12, 534:9–15. Mr. Aboeid made no effort to independently determine the cost of a ticket from London or Paris to New York and instead chose to remain in Jeddah, apparently hoping that nine seats would open up on a Saudi Airlines flight to JFK. *Id.* at 149:3–8, 150:3–10.

Plaintiffs were told by Saudi Airlines employees to "come back tomorrow" to seek alternative passage back to the United States. *Id.* at 80:4–10. That night, the

---

**2.** Plaintiffs argued Flight SV 21 was not, in fact, closed at the time they unsuccessfully attempted to check in for the flight. *See, e.g.,* Tr. at 269:6–270:14. However, having reviewed the weight of the evidence and the credibility of witnesses at trial, the Court rejects Plaintiffs' characterization of the status of Flight SV 21 in the early hours of July 24, 2008.

Aboeid family slept on the floor of the airport mosque. *Id.* at 80:11–13. The next day, Mr. Aboeid attempted to speak to Saudi Airlines representatives to arrange alternative passage back to the United States. *Id.* at 81:11–23. The Aboeid family then spent another night in the airport mosque, one night with a friend, and then several nights more in a hotel. *Id.* at 84:16–24. Mr. Aboeid attempted to speak with Saudi Airlines representatives about his family's situation on several occasions during this time. *Id.* at 83:11–84:13, 84:25–85:2, 89:23–90:5. Mr. Aboeid claims that on several occasions during this period, Saudi Airlines employees referred to him using racially derogatory language. *Id.* at 82:8–83:10.

Saudi Airlines did not offer any denied boarding compensation to Plaintiffs or otherwise pay for Plaintiffs' expenses. *Id.* at 89:17–22. Finally, on July 30, 2013, a Saudi Airlines representative told Mr. Aboeid the family's tickets were no longer valid and that the airline would not honor them. *Id.* at 90:6–22. In the end, Plaintiffs purchased tickets on Egypt Air to JFK by way of Cairo, Egypt; Plaintiffs departed on an Egypt Air flight from Saudi Arabia on August 3, 2008. *Id.* at 93:16–20; Abdelgadir Dep. Tr. at 62:17–63:2.

### D. Complaints Following Plaintiffs' Trip

In April 2009, Mr. Aboeid made a written complaint to the Better Business Bureau seeking a refund of the JED–JFK portion of the family's tickets and explaining the family's experience in Jeddah. Tr. 108:8–19; *see also* Ex. C ("Correspondence Regarding Plaintiffs' Complaints"). In July 2009, Mr. Aboeid made an identical or similar written complaint to his Congressman, Brad Miller. Tr. 107:3–25; *see also* Correspondence Regarding Plaintiffs' Complaints. Neither of these complaints alleged or referred to racial discrimination by Saudi Airlines at JFK or JED. Tr.

108:1–19. In October 2009, Mr. Aboeid retained an attorney, James Ruane, who made a written complaint on Mr. Aboeid's behalf to Saudi Airlines regarding the family's experience in Jeddah and requesting compensation for expenses incurred by the Aboeid family such as purchasing replacement plane tickets, paying certain fines for overstaying the family's visas, and replacing lost luggage. Tr. 109:3–12, 111:23–1 12:6; *see also* Ex. E ("Letter by James Ruane"). Similar to Mr. Aboeid's complaints to the Better Business Bureau and Congressman Miller, Mr. Ruane's letter did not refer to any alleged racial discrimination by Saudi Airlines at JFK or JED.

### E. Alleged Damages

In addition to economic damages, Plaintiffs allege emotional damages arising out of their transportation experience with Saudi Airlines in June and July of 2008, based on various diagnoses assessed by psychotherapeutic expert Denise D. Pastoor. Tr. 303:9–23. Ms. Pastoor's assessment of those diagnoses was based entirely on Plaintiffs' own accounts, without consideration of possible alternative causes. *Id.* at 313:14–315:7.

In the five years since their trip in the summer of 2008, no member of the Aboeid family has received any treatment by any mental health professional relating to his or her alleged emotional distress. *Id.* at 202:23–203:4, 164:14–18. Plaintiffs claim they cannot afford treatment by a mental health professional, but they admit they have not determined whether such treatment would be covered by their health insurance or how much any such treatment might cost. *Id.* at 164:24–165:9.

### II. Conclusions of Law

### A. Breach of Contract

Plaintiffs argue Defendant breached its contracts with the Aboeid family by failing to board Plaintiffs on their return flight

from JED, failing to provide Plaintiffs alternative return passage to the United States, failing to provide Plaintiffs accommodations as they attempted to secure alternative return passage, and failing to refund Plaintiffs for the cost of their unused tickets. Tr. 551:6–10, 553:15–18, 565:2–566:11. Saudi Airlines responds that it did not breach its contracts with Plaintiffs because Plaintiffs failed to perform the conditions of the contracts by not arriving at the check-in counter in Jeddah before the flight had closed, which failure absolved Defendant of any contractual obligation to provide "denied boarding" compensation or other accommodations. Def.'s Proposed Findings of Fact & Conclusions of Law, Dkt. No. 156, at ¶¶ 18–21.

■■■ On July 2, 2013, in its order denying Plaintiffs' motion for summary judgment, this Court concluded that New York law properly applies to Plaintiffs' claim for breach of contract. *Aboeid v. Saudi Arabian Airlines Corp.,* No. 10–CV–2518, 2013 WL 3340475, at *10 (E.D.N.Y. July 2, 2013) (Kuntz, J.). Under New York law, "to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 52 (2d Cir.2011). "Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide,'" and where the contract is unambiguous, a court is "required to give effect to the contract as written." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97

F.3d 632, 637 (2d Cir.1996) (citations omitted).

■■■ The Court concludes Saudi Airlines did not breach its contracts with Plaintiffs because Plaintiffs have not shown by a preponderance of the evidence that they performed the contractual obligations explained in the terms and conditions of Plaintiffs' tickets. One of the terms and conditions of Plaintiffs' tickets was that Plaintiffs must arrive at the airport "early enough to complete departure procedures." Tr. 223:25–224:16, 405:20–406:13; Saudi Arabian Airlines Terms, Conditions, Passenger Advice, Notices and Liability Limitations. Saudi Airlines advises passengers that flight check-ins close one hour before departure. Tr. 405:20–407:1. When passengers purchase their tickets on Saudi Airlines electronically, they are advised of this requirement in the online terms and conditions attached to the tickets. *Id.* at 406:7–13. Because Plaintiffs purchased their tickets electronically, they were aware of Saudi Airline's check-in requirements. *See Consol. Edison Co. of N.Y. v. United States,* 221 F.3d 364, 371 (2d Cir.2000) ("In general, individuals are charged with knowledge of the contents of documents they sign—that is, they have 'constructive knowledge' of those contents."); *see also McCracken v. Best Buy Stores, L.P.,* 248 F.R.D. 162, 167 (S.D.N.Y. 2008) (Chin, J.) ("Parties also have a duty to read what they sign.").

Nevertheless, it is undisputed the Aboeid family did not enter the correct line for checking in to Flight SV 21 until 1:20 A.M. at the earliest, when they found four or five passengers already in the line in front of them.[3] Tr. 77:24–78:11. Given that Flight SV 21 was scheduled to depart

---

**3.** Though the refusal of several Saudi Airlines employees to help Plaintiffs locate the correct check-in counter earlier is disturbing, Plaintiffs ultimately bore responsibility for timely checking in, as JED had signs in English to direct passengers to the appropriate departure check-in areas. Tr. 497:1–498:20.

at 2:20 A.M., the flight closed at 1:20 A.M. At a minimum, it would have taken several more minutes for the four or five passengers in front of the Aboeid family to check in, meaning Plaintiffs did not reach the check-in counter until after 1:20 A.M. Under these circumstances, "Plaintiffs did not comply with [the terms of their contracts] by being in line, but not actually checked-in, one hour before their flight and Defendant did not breach its contract of carriage by refusing to allow Plaintiffs to board." *Giuffre v. Delta Air Lines, Inc.*, No. 10–cv–1462, 2012 WL 3988981, at *5 (E.D.N.Y. Sept. 11, 2012) (Irizarry, J.).

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

■■■ Plaintiffs' second cause of action is for breach of the implied covenant of good faith and fair dealing, predicated on Defendant's failure to fly Plaintiffs from JED to JFK, to rebook them on another flight, or to refund them the cost of their tickets. *See* Am. Compl. at ¶¶ 37, 40. However, as explained in this Court's earlier summary judgment opinion, *see Aboeid*, 2013 WL 3340475, at *12, and as Plaintiffs concede in their trial brief, *see* Pls.' Trial Br., Dkt. No. 151, at 7, "[u]nder New York law, parties to an express contract are bound by an implied duty of good faith, 'but breach of that duty is merely a breach of the underlying contract.'" *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992). "[I]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. United Techs. Corp.*, 610 F.3d 44, 54 (2d Cir.2010) (internal editing and quotation marks omitted). Accordingly, because Plaintiffs' claim for breach of the

covenant of good faith and fair dealing is predicated on Defendant's refusal to board the Aboeid family in Jeddah, book them on another flight, or refund Plaintiffs' tickets, the claim duplicates their breach of contract claim and may be "disregarded as superfluous." *Id.; see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir.2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.").

### C. Violations of 42 U.S.C. § 1981 and N.Y. Executive Law § 296

Plaintiffs' third and fourth causes of action are for alleged violations of Section 1981 and the New York Human Rights Law. Plaintiffs argue their segregation during check-in at JFK was racially discriminatory and that such discrimination affected their contractual right to select seats on the outbound flight on a first-come, first served basis. Tr. 549:13–19. As discussed below, the Court concludes Plaintiffs have not proven Defendant acted with discriminatory intent in separating Plaintiffs from the check-in line at JFK, and accordingly dismisses Plaintiffs' Section 1981 and NYHRL claims.

■■■ "The standards governing claims pursuant to section 1981 and the NYHRL are identical." *Perez Rivera v. Hertz Corp.*, 990 F.Supp. 234, 236 (S.D.N.Y.1997) (Jones, J.); *see also Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir.2012); *Mahmud v. Kaufmann*, 454 F.Supp.2d 150, 157 (S.D.N.Y.2006) (Conner, J.). "To establish a claim under 42 U.S.C. § 1981, plaintiffs must [prove by a preponderance of the evidence] facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination con-

cerning one of the statute's enumerated activities." *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir.2000). "Those enumerated activities include the rights 'to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property.'" *Id.* (quoting 42 U.S.C. § 1981(a)). The Supreme Court has unequivocally held that Section 1981 "can be violated only by purposeful discrimination." *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *see also Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988) (en banc) ("Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated.") (internal citations omitted). "A plaintiff may rely on direct evidence or circumstantial evidence to prove discriminatory intent." *Harvey v. NY-RAC, Inc.,* 813 F.Supp. 206, 209 (E.D.N.Y. 1993) (Glasser, J.) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)).

"Where, as here, a plaintiff does not allege any direct evidence of discrimination, he must proceed under the well-established burden-shifting framework the Supreme Court developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Weiss v. La Suisse,* 260 F.Supp.2d 644, 650 (S.D.N.Y.2003) (McMahon, J.) (citing *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000)); *see also Brown v. City of Syracuse,* 673 F.3d at 150 (applying *McDonnell Douglas* framework to Section 1981 and NYHRL claims). "Under that framework, a plaintiff must first establish a *prima facie* case. If the plaintiff establishes a *prima facie* case, 'a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscrimina-

tory reason' for the allegedly discriminatory act(s)." *Weiss,* 260 F.Supp.2d at 650 (quoting *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001)). At the second stage of the burden-shifting framework, the Court's analysis "can involve no credibility assessment" of the defendant's evidence, for the defendant's burden is one of production, not of persuasion. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

██ "If the defendant bears its burden of production, the presumption of discrimination 'drops from the picture' and the plaintiff 'must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.'" *Weiss,* 260 F.Supp.2d at 650–51 (quoting *Weinstock,* 224 F.3d at 42). At this third stage of the burden-shifting framework, a plaintiff must show "*both* that the [non-discriminatory] reason was false, *and* that discrimination was the real reason" for the defendant's adverse action. *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742 (emphasis in the original); *see also McCarthy v. New York City Technical Coll. of City Univ. of New York,* 202 F.3d 161, 166 (2d Cir.2000) ("[A defendant's] assertion of false reasons does not eliminate the requirement that the evidence, considered in its entirety, including any inference reasonably drawn from the falsity of the proffered reasons, must be capable of supporting a reasonable finding that the true reason was the prohibited discrimination plaintiff alleges."). While "disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, ... *permit* the trier of fact to infer the ultimate fact of intentional discrimination," judgment in favor of the plaintiff is by no means compelled in those circumstances.

**310**

*St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742. A plaintiff asserting a claim under Section 1981 "at all times bears the 'ultimate burden of persuasion.'" *Id.*

In its earlier order denying Plaintiffs' motion for summary judgment, this Court concluded both that Plaintiffs had made out a *prima facie* case of race discrimination and that Defendant had successfully proffered a non-discriminatory reason for its treatment of Plaintiffs at JFK. *Aboeid*, 2013 WL 3340475, at *14–15. Plaintiffs established their *prima facie* case by showing that they were both the only black or African–American passengers in the check-in line, and also the only passengers who were segregated from that line. *Id.* at *14. Defendant responded by producing evidence that Plaintiffs may have been delayed from boarding their flight because Saudi Airlines employees had to manually weigh their eighteen pieces of checked luggage. *Id.* at *15. Thus, the presumption of discrimination has dropped from the case, and Plaintiffs have the burden of showing Defendant's proffered non-discriminatory reason is pretextual. *See Weiss*, 260 F.Supp.2d at 650–51. At this stage, not only must Plaintiffs show Defendant's reason is false, but they must also show the actual reason for the delay was intentional discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742.

■ The Court does not reach the issue of whether Defendant's proffered non-discriminatory reason was pretextual because the Court concludes Plaintiffs have not shown by a preponderance of the evidence that Saudi Airlines separated the Aboeid family from the check-in line at JFK because of intentional discrimination. Plaintiffs adduced no additional evidence at trial, beyond their *prima facie* allegations, that Saudi Airlines discriminated against Plaintiffs based on their race or color. As the Court noted in its summary judgment order, "[w]hile a finder of fact could ultimately conclude that Defendant intentionally discriminated against Plaintiffs" based solely on the facts that Plaintiffs were treated differently and were the only black passengers on the check-in line, "a reasonable factfinder could likewise decide Defendant did not discriminate against Plaintiffs." *Aboeid*, 2013 WL 3340475, at *17. Having evaluated the evidence and assessed the credibility of witnesses at trial, this Court finds Plaintiffs have not met their burden of showing Saudi Airlines' actions reflect intentional discrimination. Plaintiffs' Section 1981 and NYHRL claims must therefore fail.

### III. Conclusion

At the conclusion of his oral argument, counsel for Plaintiffs curiously selected two historical items to share with the Court: first, he argued that the Court should hold onto the dreams of Robert F. Kennedy and the Rev. Dr. Martin Luther King, who were both assassinated during the terrible summer of 1968, Tr. 596:24–597:15; second, he cited the infamously chaotic trial of those alleged radicals he referred to as "The Chicago Seven." *Id.* at 600:1–12. Mr. Stone was inaccurate. First, Senator Kennedy and Dr. King were assassinated not in the summer, but rather in the spring of 1968. Second, the Chicago trial he cited is more accurately recalled as the Trial of the Chicago *Eight*, not Seven, because the eighth member of the defendants' group was African–American Black Panther Party Founder Bobby Seale. To forget the fact of his binding, gagging, and ultimate exclusion from that trial is to forget an important chapter in American legal history.

Counsel for Defendant also made a historical allusion that deserves comment from the Court. Describing racism as

"difficult to define," defense counsel said "we know it when we see it," a not-so-subtle reference to Justice Stewart's famous concurrence in *Jacobellis v. Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964), regarding the definition of hard-core pornography. In his concurrence, Justice Stewart wrote: "I shall not today attempt to further define the kinds of materials I understand to be embraced within that shorthand description ["hard-core pornography"]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, *and the motion picture involved in this case is not that.*" 378 U.S. at 197, 84 S.Ct. 1676 (emphasis added).

Having reviewed with care the facts and law in this case, this Court adopts the wisdom of Justice Stewart, who, addressing the definition of racism might have put it this way: "I shall not today attempt further to define the kinds of material I understand to be embraced within the shorthand description of racism, and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, *and the behavior involved in this case is not that.*"

Like Justice Stewart, this Court can truly say of racism: "I know it when I see it." This Court did not see it in this case. The Court finds no liability on the part of Defendant for any of Plaintiffs' causes of action. Judgment for Defendant on all counts. The Clerk of the Court is directed to enter judgment in favor of Defendant.

*SO ORDERED*